Commonwealth *v.* Hawk, Appellant.

Argued November 23, 1937. Before SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

418

*Edmund C. Wingerd,* with him *D. Edward Long,* for appellant.

*J. Glenn Benedict,* District Attorney, with him *Edwin D. Strite,* Assistant District Attorney, for appellee.

OPINION BY MR. JUSTICE DREW, January 3, 1938:

The defendant having pleaded guilty to the murder of two persons, the learned court below, after a hearing and consideration of the evidence produced, adjudged him guilty of murder of the first degree and fixed the penalty at death. From the judgments and sentences imposed these appeals have been taken, as well expressed in defendant's brief, ". . . on the ground that the state or condition of defendant's mind was such that, although he had intelligence and was responsible, from a legal standpoint, for his crime, he was not as responsible for his acts as a normal person, and, therefore, should not be subjected to the extreme penalty of death, but should be sentenced to imprisonment for life." It is conceded that the finding of first degree was proper.

There is no doubt that this court has power to modify a sentence (Act of June 16, 1836, P. L. 784) and will do so when justice and right require it. In *Commonwealth v. Garramone,* 307 Pa. 507, we did that which is now requested here, because ". . . the imposition of a sentence of death, instead of life imprisonment, was such abuse of discretion as to require modification by resentence."

The imposition of the death penalty for first degree murder was mandatory (Act of March 31, 1860, P. L.

382, section 75) prior to the Act of May 14, 1925, P. L. 759, which provides, inter alia, that, "In cases of pleas of guilty the Court where it determines the crime of murder of the first degree, shall at its discretion impose sentence of death or imprisonment for life." The Act of 1925 thus recognized two classes of first degree murder, one punishable by death and the other punishable by life imprisonment. Murder of the first degree should not always be punished by death; when sufficient mitigating circumstances are present, the punishment should not exceed life imprisonment. The discretionary power given to the tribunal charged with the duty of hearing and deciding upon the evidence must not be abused. It is only to prevent such abuse that this court will interfere. There are no fixed or arbitrary standards provided by law regulating the exercise of that discretion: *Commonwealth v. Harris,* 314 Pa. 81; *Commonwealth v. Sterling,* 314 Pa. 76. The guiding principle is that a sound discretion must be applied to the acts and circumstances of each case.

The evidence clearly shows a case of murder in the first degree for two reasons: (1) there was a wilful, deliberate and premeditated killing, and (2) there was a killing in the commission of arson. The crime was particularly inhuman and atrocious. For the purpose of avoiding an expedient marriage, defendant attempted to murder by burning his fiancee, her mother and sister. The murder was carefully planned and carried out, and concealed with such cunning that only the escape of his fiancee and her accusation that he had been present at the time and place led to his confession.

The appropriateness of the penalty is the only question before us. The facts of the crime and defendant's background are important. The facts are gathered from defendant's voluntary confessions and his own testimony. He was twenty years of age at the time of the murder, of average education and intelligence, having left high school to go to work. He was a faithful and

industrious employee, and of good reputation. He had been seeing Catherine Gelwicks and she had become pregnant by him. Late in December, 1936, her mother discovered her condition and sent for defendant; he agreed to marry her on January 2, 1937. During the next week he was a frequent visitor at the house. On the evening of December 31, 1936, he remained after the mother and younger sister, the only other members of her family, had retired. After sitting awhile with the defendant, Catherine went into her bedroom, just off the living room, and lay on her bed fully clothed. Shortly after defendant followed and lay beside her. They listened to the radio for quite some time when she fell asleep. He began thinking of his marriage less than two days away. Marriage under the circumstances was objectionable to him, and he conceived this crime to avoid it. When certain that Catherine was sleeping, he got up, took a flash light from her dressing table and rendered her unconscious by a single blow on the head. He then procured the kerosene reservoir from the oil stove in the kitchen, went to the bedroom shared by Mrs. Gelwicks and her younger daughter, turned on the light to see if they were sleeping, turned it off, and poured part of the kerosene on their bed. He then went to Catherine's room and sprinkled the rest of the oil upon her clothing and bed. He replaced the reservoir on the stove, went to Mrs. Gelwicks' room, lighted a match to the bedclothes, and waited to see that the flame was well kindled. He closed the door, walked to Catherine's room, struck a match, but, whether because his courage failed or because the match went out, he did not ignite her bed. He said in his statement he ". . . could not do it." He left the house through a window so the doors would be locked from the inside, took his car, drove for some distance without lights, proceeding to the farm where he lived and worked. He went directly to his room, and to his employer's questions about the fire, the latter having heard the fire

engine going by, replied that it was the Gelwicks' house, that women were burning, and that it was caused by an overheated furnace. Later that night when several of his friends came to inquire after his safety, knowing he was frequently at the house, he was roused from apparently sound sleep.

After defendant's departure Catherine regained consciousness in sufficient time to stand at the window and cry out to neighbors who had been attracted by the fire. They removed her and took her to a hospital. She was semi-conscious and suffering from a fractured skull; her mother and sister were burned to death; the house was completely destroyed.

These facts are not controverted. The defendant relied entirely upon the evidence of psychiatrists to establish a mental condition which it is urged should reduce the sentence from death to life imprisonment. Four psychiatrists were called, two for the defendant and two for the Commonwealth. They agreed the defendant knew right from wrong, knew the consequences of his act so far as his intelligence was concerned, but that he was so defective emotionally that he did not fully realize what he was doing, and that he was not as responsible for his acts as a normal person. In scientific language they declared that he was emotionally inadequate. Their opinions were based upon the history of the case which they had received and upon examinations which they had separately made of him.

The court below received all the evidence offered in respect to defendant's mental condition. That it was carefully considered is shown by the painstaking opinion subsequently filed. It is perfectly clear full consideration was given it as an element in mitigation and extenuation. We held in *Commonwealth v. Stabinsky*, 313 Pa. 231, that evidence of mental weakness should be considered by the jury in fixing the penalty for first degree murder under the Act of 1925, supra. No doubt

it must also be considered by the court when acting upon a plea of guilty. Here that was done, with a care and completeness that cannot be criticised, and unless the court ". . . overlooked pertinent facts or has disregarded the force of evidence or erred in its law, we are without authority to act.": *Commonwealth v. Sterling,* supra, at page 80. After a thorough examination of the whole record, we are satisfied that full and fair consideration was given all the evidence, itself very complete on the disputed point.

No one claims that any signs of mental weakness were manifest in defendant before his crime. In a word, it was the atrocious crime, and the cold-blooded and callous conduct of the defendant afterward that in a large measure supported the opinions of the psychiatrists. These opinions were epitomized in the language of defendant's psychiatrist, Dr. Gillis, "If you can use the word cold-blooded, it is that type,—that's the point I am making. This boy was cold-blooded. He showed so little emotion during,—following,—we don't know at the time of course, we have no evidence of that, —but we have evidence here, other evidence showing this boy, was quite cool and collected, and to my way of thinking abnormal."

After the crime defendant apparently showed no regret, remorse, or even excitement. He returned immediately to the farm where he lived, going at once to bed and apparently to sleep. His friends who called on him later that night noticed nothing unusual in his demeanor. The morning after the fire he went with his employer to the scene, and viewed, without perturbation, the removal of the bodies of his victims from the ashes in the cellar. When taken by the police to the hospital to confront Catherine and hear her accusation he denied the charge with seeming composure. Later he made several confessions without a change of attitude. He attended the hearing in the court below without any visible indication of feeling except briefly when

Catherine testified. He seemed to eat and sleep normally. It was from this course of conduct under these circumstances that the psychiatrists all concluded that he was without normal emotional balance, and, therefore, not possessed of entirely normal capacity to resist the temptation to do what he knew to be wrong.

The court below need not have disagreed with the scientific opinions of the expert witnesses to hold that death was the proper penalty. That diminished responsibility was a factor to be considered in selecting the penalty admits of no doubt (*Commonwealth v. Stabinsky,* supra) but the effect of the factor is a matter for separate determination in each case. The *extent* to which responsibility is diminished is a matter of the greatest importance. Abnormality may present itself in any number of varying degrees: Glueck, Studies in Forensic Psychiatry (1916) p. 32; White, Insanity and the Criminal Law (1923) p. 89; Hoag, Crime, Abnormal Minds and the Law (1923) p. 77. Cases may range from that of common lack of will power to that of pathological schizophrenia. At both extremes responsibility is diminished, but the great difference in extent suggests at once the fitness of entirely different consideration. With this in mind, and based on its conclusion that defendant's aberration from normal was slight, the court below refused to impose less than the extreme penalty which the crime itself made appropriate.

This record shows that defendant knew exactly what he was doing, before, during, and after the crime; that he understood the nature and consequences of his act; that he wilfully and deliberately murdered two, and attempted to destroy three, unsuspecting women; that with much cunning during the perpetration of the crime, and afterward, he attempted to hide his guilt. The facts show conclusively that even though emotionally defective the variation was so negligible that he was as responsible for his acts as a normal person. There

is not anything in the case, including the testimony of the psychiatrists, that should cause a judge to hesitate to mete out to him the only penalty of the law which approximates the crime. This has been done. The discretion vested by the Act of 1925 in the sentencing judge was wisely and judicially exercised.

Judgments and sentences affirmed and records remitted for purposes of execution.