## Commonwealth *v.* Irelan, Appellant.

Argued January 9, 1941.  Before SCHAFFER, C. J., MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

44

*James McG. Mallie,* with him *Joseph F. Murphy,* for appellant.

*John A. Boyle,* Assistant District Attorney, with him *Charles F. Kelley,* District Attorney, for appellee.

OPINION BY MR. JUSTICE DREW, January 31, 1941:

Defendant was indicted for the murder of her infant son, called Charles Irelan. A true bill having been found, she pleaded not guilty. Two weeks later, by leave of court, she withdrew her plea of not guilty and entered a plea of guilty. The court en banc, after hearing evidence produced on behalf of the Commonwealth and also on behalf of defendant, adjudged her guilty of murder of the first degree and imposed sentence of death. Defendant appeals.

Defendant states but a single question for review: Did the court err in imposing sentence of death? Section 701 of the Act of June 24, 1939, P. L. 872, provides that "In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life." It is contended that under the facts of the instant case the imposition of the sentence of death, instead of life imprisonment, was such abuse of discretion as to require modification by resentence. In this connection the Assistant District Attorney representing the Commonwealth stated at the oral argument of the appeal that it was the considered opinion

of the District Attorney's Office that the proper sentence should be life imprisonment.

As a child Matilda Irelan, defendant, attended public schools, progressing to the eighth grade at the age of sixteen years. Thereafter she received no further education, obtaining employment in various factories and mills. Residing with her parents, a family of good reputation, she continued to work until at the age of twenty-one years she married Arthur Irelan, an iron worker foreman. This marriage proved to be a tragic failure. Mr. and Mrs. Irelan lived together for seven years, during which time a daughter was born to them. Witnesses testified without contradiction that defendant was always kind and devoted to her child and the children of her sisters and never showed any tendency towards cruelty to children; furthermore, that she was a loving wife, a good housekeeper and neighbor, and bore a respectable reputation in the neighborhood. Irelan, however, frequently became intoxicated and, when in this condition, he would administer violent physical beatings to his wife. This continued to such an extent that she finally had to have him arrested and held under $500 bail to keep the peace. Despite such action, though, he continued to abuse defendant, kicking her down steps on one occasion and, a few weeks thereafter, kicking her in the head, as a result of which she suffered a broken jaw, bruises about the head, protracted headaches and vertigo. After seven years of such married life, Irelan moved from Philadelphia to Baltimore to live, but, when his family sought to join him there, he refused to establish a home for them, insisting that they live in Philadelphia, where he occasionally visited them. This existence continued for a period of three years, after which Irelan deserted his wife and child.

Irelan's desertion completely broke up the family group, since it was then necessary for the mother to

place her daughter with foster parents, so that she might obtain work as a domestic, for which she received an average salary of $6 per week and board and lodging. While thus working she became intimate with a Charles Rebel, with whom she subsequently went to live. As a consequence of this relationship a child, the deceased, was born. Thereafter mother, father and son lived together for some time as a family, but eventually Rebel tired of defendant and put her and her son out of his home. Once again Mrs. Irelan, in a thoroughly destitute condition, had to make her own way, and this time she would not let her sisters or friends know of her plight because of her new baby. Obtaining employment as a domestic, defendant placed the baby with a Miss Maurer, agreeing to pay from her meager wages $5 per week for the child's board. Never did she neglect the child, visiting him on each of her free days and always "fondling him and making a fuss over him." There is no doubt that with her very small means she made the child as comfortable as she could. After ten weeks of living under such circumstances, however, defendant took her baby from Miss Maurer and smothered him to death.

Defendant had no previous criminal record and had never been arrested or involved in any violation of the law. The psychiatrists, who examined her, testified that, although she was not actually insane or feeble-minded, "she was below or at least at the very minimum level of intelligence"; that, therefore, she had "a smaller range of selectivity as to action than would be had by the average human being"; that she did not have the ability to think things through to a logical conclusion; that she was not antisocial; that her sordid sex life was "part and parcel" of her condition; and that under fair conditions of life, living with the right kind of people, not pressed by extreme poverty, this would not have happened to her. These facts, together with

the foregoing history of the case and the opinion of the District Attorney's Office, which had full opportunity to understand the whole case, call for the milder of the two possible sentences. The Legislature, in its wisdom and mercy, recognized that murder of the first degree should not always be punished by death. When sufficient mitigating circumstances are present, the punishment should not exceed life imprisonment. The decision as to which penalty better fits the particular crime is wisely left to the sound discretion of the trial court. While no fixed or arbitrary standard can be provided for the exercise of this discretion in all cases, because it must be applied to the varied facts and circumstances of each case, nevertheless this discretionary power should never be abused. If abuse appears, this court will act to correct it: *Commonwealth v. Hawk*, 328 Pa. 417. The imposition of a sentence of death in this case, instead of life imprisonment, was such abuse of discretion as to require modification by resentence.

The sentence of death is vacated and the record is remitted with instructions to sentence the defendant to imprisonment for life according to law.