## Commonwealth v. Meholchick

*Leon Schwartz*, district attorney, for Commonwealth.

*Patrick J. O'Connor* and *E. F. McGovern*, for defendant.

APONICK, J., July 2, 1945.—Defendant in this case has pleaded guilty to an indictment charging murder. It, therefore, becomes incumbent on the court to fix the degree of the crime and also the punishment: The Penal Code of June 24, 1939, P. L. 872, sec. 701; 18 PS §4701. Testimony was taken before three members of the court, oral argument was heard and briefs submitted.

On the question of the degree of the crime we have little difficulty. From the testimony, and particularly from the confession of the defendant, we have no hesitancy in finding that the murder was committed while defendant was attempting to commit rape upon the

deceased. The section of the statute cited above makes a murder committed under such circumstances murder in the first degree. We, therefore, find defendant guilty of murder in the first degree.

The question of the punishment to be meted out to defendant, whether it be death or life imprisonment, is not so easily determined. The statute merely provides that there is such alternative and contains no guide which the court may use in fixing the punishment. The cases which come before the Supreme Court do not present the question which is before the trial court. The only question for the appellate court to determine is whether or not the lower court abused its discretion, and unless such abuse clearly appears, the Supreme Court will affirm the judgment, without passing on the propriety of the action of the lower court: Commonwealth v. Sterling et al., 314 Pa. 76, 80.

Certain general principles may, however, be gleaned from the opinions of our highest court. Where the offense is lessened because of the mitigating circumstances arising from the emotions or the pressure of events under which the offender acted, or for other satisfactory cause, the court is justified in fixing the lesser of the two penalties: Commonwealth v. Sterling et al., supra, at p. 78. If, however, the homicide is the result of a mental, rather than an emotional, impulse, the death penalty is the proper punishment: Commonwealth v. Sterling et al., supra, at p. 80. Mental irresponsibility or weakness of the defendant, though it fails to approximate the legal standard of insanity, may serve to reduce the penalty from death to life imprisonment: Commonwealth v. Stabinsky, 313 Pa. 231; Commonwealth v. Hawk, 328 Pa. 417, 421. The previous good character of defendant, coupled with the fact that the crime was committed under stress of the emotions, justifies the imposition of the lesser penalty: Commonwealth v. Garromone, 307 Pa. 507. The past history of defendant, his station in life, his degree of intelli-

gence and all other circumstances are proper to be considered in fixing the punishment: Commonwealth v. Irelan, 341 Pa. 43.

The problems which face the trial court in fixing a sentence in a case of this character have been considered in only a very few reported cases: Commonwealth v. Ritter, 13 D. & C. 285; Commonwealth v. Scott, 14 D. & C. 191; Commonwealth v. Dearolph, 41 D. & C. 643; Commonwealth v. Pickwell, 26 Luzerne 63. In each of these cases the penalty was fixed at life imprisonment, upon the theory either that the crime was one arising out of the emotions and not as the result of mental processes, or that the defendant was mentally irresponsible. The whole question was ably and thoroughly considered in Commonwealth v. Ritter, supra, in a scholarly opinion by Judge Horace Stern, now a member of our Supreme Court. The doctrine of that case has been tacitly approved by the Supreme Court: Commonwealth v. Sterling et al., supra; Commonwealth v. Stabinsky, supra. We shall not quote extensively from the Ritter case, but we shall follow the doctrine and reasoning of that case and apply it to the present situation. In approaching the problem it is well to consider that the penalty of life imprisonment is not so much a substitute for capital punishment as a slower method of inflicting it: Commonwealth v. Ritter, supra; Commonwealth v. Pickwell, supra.

At the time of the commission of the crime, defendant was 19 years of age. His father died when he was six months old and his mother died when he was 12. He was raised by two older sisters and an older brother and lived with them until he was about 15. He then went to a C. C. C. camp where he remained for 18 months. On February 9, 1942, at which time defendant was only 16 years old, he enlisted in the United States Army at Missoula, Montana. He was discharged May 29, 1943, under circumstances which will be discussed later. On that day he was admitted to the Veterans

Hospital at Lyons, New Jersey. He "eloped" from that institution on July 9, 1943, and remained at large until March 10, 1944, when he was returned to that hospital by the Newark police. He remained about ten days and then "eloped" again and was at large until arrested upon the present charge.

The discharge of defendant was based on medical reasons. Before such discharge was granted, a certificate was prepared by the doctors of the Army Hospital at Lincoln, Nebraska, which reads, in part, as follows:

"We find: that he is unfit for service as a soldier because of

"1. Psychosis, unclassified. . . .

"2. Manifestations:

"a, Emotional immaturity; b, childishness; c, marked defects of judgment; d, does not learn by experience; e, impulsive reactions; f, inconsiderate of others; g, emotional instability with rapid swings for trivial causes; h, criminal traits; i, moral deficiency; j, vagabond; k, chronic alcoholism; l, episodic attacks of excitement, irritability, paranoid episodes, suicidal depression. . . .

"4. Disability is permanent and progressive.

"5. Further hospitalization in an institution for the insane is considered necessary because the soldier is potentially dangerous to himself and others."

When defendant was taken to the Veterans Hospital at Lyons, New Jersey, he was accompanied by medical personnel and his discharge from the army did not become effective until he had been accepted by the hospital authorities. He was not committed to the hospital in the legal sense of the word, but entered as a "volunteer". It was for that reason that no effort was made to bring him back when he "eloped". He could not be forced to stay at the hospital and the authorities could not secure his return because he was there on a voluntary basis.

The records of the army hospital where defendant was a patient were offered in evidence, including the progress notes. They disclose that defendant twice attempted to commit suicide and on numerous occasions was sullen and unruly. Some of the acts of defendant clearly show a rather marked lack of sexual control.

Captain Michaels, a United States army doctor attached to the Veterans Hospital, testified that he had observed defendant during the period in which he was at that institution and that, in his opinion, he has a psychopathic personality, with psychotic episodes. He explained that by "psychotic episodes" he meant that, at such times, defendant was insane. On cross-examination, he testified as follows:

"Q. Would a psychopathic personality have more fear of punishment or less fear? A. A psychopathic personality is not able to analyze the effect or the result of his action; he is bound by his emotions that he is not concerned."

When defendant was brought to the Veterans Hospital, he was placed on acute service. Dr. Michaels explained "acute service" as follows:

"Q. What do you mean by acute service? A. Acute service is the service which is meant primarily for those patients who are acutely disturbed and may be homicidal or suicidal and require close observation."

The entire record of the handling of this case discloses such a shocking state of affairs that we think it should not go unnoticed by this court. We have here the case of a man who has been found to require hospitalization because he is potentially dangerous to himself and others, who is discharged from the army upon his being accepted at a mental hospital, the military authorities knowing full well that defendant could not be kept at the mental institution against his will. Such a situation is beyond our comprehension. This defendant was turned loose by the military authorities

to prey on innocent people such as the deceased in this case, merely because it was determined that he was of no use to the army as a soldier. Such action shows a complete disregard of the rights of others and such a situation is highly reprehensible.

We do not know where the fault lies for this situation. We are all convinced that it is not the fault of the veterans administration nor the doctors connected with the hospital at Lyons. When the defendant came to them he was not committed to them, but was accepted as a "volunteer". They could take him on no other basis and under such circumstances they had no control over him.

It may be that the fault lies with the army regulations or the army personnel, or both. It may be that the fault lies in a deficiency in the law. We do not pretend to fix the blame for this outrageous condition. We realize that army hospitals and army medical personnel should not be kept continuously at the task of controlling mentally ill patients. However, we do think that there should be some provision made and some policy adopted which would keep such patients under restraint and not turned loose on the community until they commit some serious crime.

We think that this case clearly falls within the class of crimes committed by reason of the emotions rather than by reason of any mental processes. It was a case which arose out of frenzied and jealous passion working upon a mind already weakened by reason of mental disease. Judge Stern in Commonwealth v. Ritter, supra, states the principles which should be considered in fixing a sentence as follows, page 289:

"Generally speaking, there have been advanced four theories as the basis upon which society should act in imposing penalties upon those who violate its laws. These are: (1) To bring about the reformation of the evildoer; (2) to effect retribution or revenge upon him; (3) to restrain him physically, so as to make it impos-

sible for him to commit further crimes; and (4) to deter others from similarly violating the law."

Taking all of these factors into consideration, we think that the purpose of society and the principles of penology will be adequately served by sentencing the defendant to life imprisonment. Accordingly, after testimony taken and due consideration given, defendant, Raymond Meholchick, is adjudged guilty of murder in the first degree and the sentence is fixed at life imprisonment.