Commonwealth *v.* Givens, Appellant.

Argued September 26, 1949.  Before MAXEY, C. J.,
DREW, LINN, STERN, PATTERSON, STEARNE and JONES JJ.

*Earl J. Schermerhorn*, with him *Frank A. Suffoletta*
and *Smith & Schermerhorn*, for appellant.

*William Coghlan*, District Attorney, for appellee.

OPINION BY MR. JUSTICE PATTERSON, November 14,
1949:

John William Givens appeals from judgments and
sentences of the court below adjudging him guilty of
murder in the first degree and sentencing him to death
on each of two indictments for murder.

Appellant, who was nearly fifty years of age at the
time of the killings, and his victims, Matthew Magana
and Joseph Neugebauer, both past seventy years of age,
were employed as farmhands by the Sisters of Saint
Joseph, at Mount Gallitzin Academy, located near
Baden, Beaver County, Pennsylvania.  All three resided
in a farmhouse located on the Academy property, and
appellant and Magana shared the same room.  The first
killing, that of Magana, occurred on July 17, 1947.  After
the close of the day's work, appellant and Magana did
some drinking at a tavern.  They then returned to their
room at the farmhouse, each taking some beer with him,

and were sitting on their beds drinking the beer when Magana criticized appellant for drinking too much. An argument ensued, whereupon appellant walked to a table in the room, picked up a hatchet and twice struck Magana on the head with it, crushing his skull. He then cut Magana's throat, using razor blades, covered the body with a blanket, and went to sleep in his own bed in the same room. Appellant arose and performed his usual duties the next day, July 18, 1947, did some drinking that evening at the same tavern where he and Magana had visited the previous evening, and that night again slept in the same room with the body of Magana. He admitted that he removed $25 from under the pillow of Magana's bed, but it does not appear whether this was done at the time of the killing or later. Appellant explained Magana's absence by stating that he had gone to visit relatives at West Bridgewater, Pennsylvania. The body of Magana was not found until July 19, 1947, the second day after the killing, following discovery of the unconscious body of appellant's second victim, Joseph Neugebauer.

On the morning of July 19, 1947, appellant was assigned the task of straightening up cornstalks knocked down by Neugebauer, who was cultivating in a cornfield of the Academy. When he reported for work he carried with him the hatchet used in killing Magana. He did not normally carry the hatchet and it was not required in his work. Neugebauer told him he was not needed, called him a "son of a bitch", and told him to "get the hell out of here", stating that he (Neugebauer) "would straighten it up myself." Appellant refused to leave the field and when Neugebauer stepped down from the cultivator, appellant "reached for the hammer and let him have it too". Neugebauer "went down", and when he attempted to get up appellant "hit him again" on the side of the head with the hatchet, then dragged the

unconscious body into a nearby woods. Tying Neuge-
bauers horses to a tree, appellant took Neugebauer's
keys from his pocket, returned to the farmhouse, and
removed a purse containing $115 from Neugebauer's
trunk. Appellant then discarded his work clothes and
fled. The body of Neugebauer was found several hours
later, and he was removed to a hospital where he died
the following day.

Appellant was apprehended by agents of the Federal
Bureau of Investigation in December, 1948, at Colorado
Springs, Colorado, where he was living under the as-
sumed name of John Collins. He at first denied his iden-
tity, but when confronted with positive proof of iden-
tification, waived extradition, and upon being returned
to Beaver County he made a confession, setting forth
in detail the circumstances of the killings. After in-
dictment, and prior to arraignment, President Judge
McCreary of the court below, acting on a petition filed
by counsel for appellant under the Act of July 11, 1923,
P. L. 998, section 308, as amended, 50 PS 48, appointed
a commission to determine his mental capacity to stand
trial. The members of this commission were unable to
agree and upon their recommendation Judge McCreary
appointed a second commission, which found that ap-
pellant was not insane but was of normal intelligence,
although "of a rather low mental type", and that he
was fully competent to aid and assist counsel in prep-
aration of a defense and to testify in his own behalf if
he so elected.

Represented by able counsel at every stage of the
proceedings, appellant entered a plea of guilty to both
indictments. It is conceded that he was and is legally
sane, and it is also conceded that both killings were
murder in the first degree. Nevertheless, this Court has
made an independent review of the law and the evidence
in the case, as provided by section 2 of the Act of 1870,
P. L. 15, 19 PS 1187, and finds that the ingredients

necessary to constitute murder in the first degree have been proven to exist. The sole question is whether the court erred in imposing sentences of death instead of imprisonment for life. It is argued that appellant's conduct during the course of these two brutal killings, considered in connection with the circumstances of his previous life and the testimony of two psychiatrists, reveals such a departure from normal mentality that the court below should have selected life imprisonment rather than death as the appropriate penalty.

The evidence offered by appellant in mitigation establishes that he quit school at the age of 15 years, when he was in the eighth grade, and thereafter worked in various coal mines and was a baseball player until 1924, when he separated from his wife, whom he had married in 1922, and their child, and enlisted in the army, from which he received an honorable discharge three years later. From 1927 until his employment at Mount Gallitzin Academy in 1946, he wandered from place to place doing odd jobs. During this period he served two prison terms, one in San Quentin, California, on a charge of robbery, and the other in the Ohio State Penitentiary, on a charge of larceny. Based upon appellant's life history and an interview with him, Dr. George E. Poucher, a psychiatrist, testified that in his opinion appellant suffered from a mental disorder known as "schizophrenia, simple type", and that such a person would not be mentally responsible "in the way a healthy person would". This witness also expressed the opinion that there would be some abnormality in any person committing the crime of murder. Another psychiatrist, Dr. Jane Dunaway, a witness for the Commonwealth, testified that appellant "lacks any affect or feeling whatever, with intelligence probably like one of eight years old", and that in her opinion "most any time he was morally irresponsible, or unaccountable". Dr. R. A. Marquis, a practicing physician

with a background of neuro-psychiatric experience in the armed services, stated that after talking to and carefully examining and interrogating appellant over a considerable length of time, he found no departure from normal other than the low mentality which is apt to exist in anyone with limited education. This appraisal of appellant's mental condition was corroborated by various lay witnesses, including Sister Saint Mark, his supervisor at Mount Gallitzin Academy, M. J. Kane, Chief County Detective of Beaver County, who grew up in the same district as appellant and was in constant contact with him after his apprehension and return to Beaver County, and others, all of whom testified to the effect that appellant appeared to be mentally alert and normal for a man of his age, training and education.

Upon hearing the evidence and observing appellant at the hearing, the judges of the court below, in the exercise of the discretion vested in them by the Act of June 24, 1939, P. L. 872, section 701, 18 PS 4701, determined that the death sentence should be imposed. In arriving at this sentence there can be no doubt that they considered each and every circumstance offered by appellant in mitigation of the death penalty. After reviewing all the evidence in meticulous detail and weighing its effect in the light of applicable legal principles, their opinion states: "It is with a deep feeling of regret that we, as judges, feel compelled to the conclusion we have reached in this case. We had hoped that we might some day close our judicial careers without having had to taste of the bitter cup of duty in this respect." Beyond question appellant knew what he was doing before, at the time of, and subsequent to the killings, and his own testimony reveals that he at all times understood the nature and consequences of his acts. To escape detection he removed to a distant state, and was not apprehended until eighteen months

later, living under an assumed name. Though perhaps he is emotionally unstable, the record fails to show a deviation from normal such as to relieve him from legal responsibility for the consequences of his intended conduct, and there is nothing therein to justify any reluctance in imposing the extreme penalty which his crimes themselves make appropriate.

The Act of 1939, supra, provides that "In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, *at its discretion*, impose sentence of death or imprisonment for life". The court below having determined in the exercise of its statutory discretion that the extreme penalty shall be imposed, the question on appeal is not whether this Court would have imposed the death penalty, but whether the discretion reposed in the court below was judicially exercised: *Commonwealth v. Howell*, 338 Pa. 577, 580, 13 A. 2d 521. It does not lie within our province as an appellate court to attempt the imposition of a fixed and immutable standard upon trial courts for the guidance of their discretion in discharging their statutory duty in this regard: *Commonwealth v. Samuel Jones*, 355 Pa. 522, 534, 50 A. 2d 317; *Commonwealth v. Taranow*, 359 Pa. 342, 346, 59 A. 2d 53. So long as the ingredients necessary to constitute murder in the first degree are present and the penalty imposed is in keeping with the alternatives authorized by the statute, this Court is without authority to act, unless it plainly appears that the court below erred in overlooking pertinent facts, or in disregarding the force of evidence, or erred in its law: *Commonwealth v. Hawk*, 328 Pa. 417, 422, 196 A. 5. No such error here appears, and the judgments and sentences must therefore be affirmed.

The judgments and sentences are affirmed and the records are remitted to the end that the sentences may be executed.