Commonwealth *v.* Elliott, Appellant.

Argued April 14, 1952. Before DREW, C. J., STEARNE, JONES, BELL, CHIDSEY and MUSMANNO, JJ.

reargument refused June 24, 1952.

*Barnie F. Winkelman,* with him *Arthur W. A. Cowan,* for appellant.

*Thomas M. Reed,* Assistant District Attorney, with him *Malcolm Berkowitz,* Assistant District Attorney and *Richardson Dilworth,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, May 27, 1952:

The defendant, Theodore Elliott, was indicted and tried for the murder of a police officer whom he shot in the course of an armed robbery. He pleaded not guilty, but after five days of trial changed his plea to guilty. He was 23 years old and was regularly employed in a cement factory where he earned $84 and upwards a week. The robbery was planned and executed by defendant and his cousin, John S. Frank. Frank, who shortly after his arrest confessed to the robbery, was sentenced to life imprisonment. After the plea of guilty, counsel for the defendant requested that the Court appoint a psychiatrist to examine Elliott and the Court appointed Dr. William Drayton, Jr., to act for the Commonwealth as well as for the defendant.

The three Judges who sat to impose sentence carefully considered all of the evidence as well as the report of Dr. Drayton and other matters to which we shall hereinafter refer, and found without hesitation that "the murder of Officer Mitchell was wilful, deliberate and premeditated, and constitutes murder of the first degree. Commonwealth v. Drum, 58 Pa. 1."

The Court's opinion is so able and illuminating that we quote with approval the following excerpts therefrom:

"Since the solemn choice of the penalty must be left to the conscience and unfettered judgment of the court in the light of the facts of the particular case before it, precedents are not of great value, and decisional law cannot and has not shackled the exercise of such judgment into the bonds of stare decisis.

"We are confronted with a problem of penology: Commonwealth v. Ritter, [13 D. & C., 285, 288]. 'A court is not called upon to state, and we think generally would do well to refrain from recording, in detail its reasons for the sentence it imposes in each case.' Commonwealth v. Levin, 66 D. & C. 55, 62.

"Penologists have recognized four theories upon which the imposition of punishment is based; namely, reformation, retribution, restraint and deterrence. The first has no application in this case; the second is incongruous in an era of enlightenment; the third is relatively unimportant where the choice is life imprisonment or death; the fourth must be regarded as an important objective of punishment regardless of the enormous amount of conflicting literature on the subject. 'The real question is not as to whether the death penalty is in general a deterrent, but as to the particular kinds of murder cases in which execution would or would not be most likely to effect deterrence. It becomes a problem of determining the basis upon which to make such classification.' Commonwealth v. Ritter, supra, at pages 291, 292.

"In applying theories such as these, we must consider all of the features and circumstances of the specific crime and the history of the defendant who committed it. A distinction has been made between crimes of mental as opposed to emotional impulse. A

74

diabolically planned murder by poison or lying in wait for some mercenary or similar motives requires the death penalty; whereas, a killing engendered for reason of passion, though with the necessary elements of a specific intent to kill, may be considered differently. Certainly a murder committed in the course of an armed robbery, ruthlessly shooting down the first obstacle of human resistance, as was the case here, demands the former penalty. The unwarranted murder of Officer Mitchell was such a crime.

"In turning to the individual who committed this crime, we are concerned with his depravity. The facts of this murder convince us that he is an individual who is dangerous to society and undoubtedly of savage nature. There was no reason to mow this victim down in cold blood, no occasion to fire so precipitously except as a manifestation of a savage and depraved nature.

"His personal history is replete with crime from an early age; larcenies, burglaries, hold-ups, possession of firearms, and confinement on at least three occasions to correctional institutions. Although his mental level is allegedly low as measured by psychological testing, he exhibited throughout the trial an innate shrewdness and sharp perception. He was characterized by the detectives as the leader of a long series of crimes and his aggressive tendencies corroborate such a conclusion.

"There were no economic pressures which excited this lust for crime. His work record was steady; his earnings adequate. We have searched his history carefully for some justifiable explanation. We have found none, only a depraved, cruel, ruthless and brutal individual. There can be but one choice.

"The court therefore adjudges the defendant, Theodore Elliott, to be guilty of murder in the first degree and fixes the penalty at death."

Counsel for defendant admits that he was not legally insane, but contends he was so mentally deficient as to justify only a sentence of life imprisonment. Mental deficiency is a fact which always should be and in this case was taken into consideration in determining and fixing the penalty or sentence. However, no case in Pennsylvania has ever decided that a trial Judge or a Supreme Court *must, as a matter of law,* reduce a sentence from death to life imprisonment because the defendant is an unstable, weak moron or a mental defective.

Dr. Drayton had examined Elliott in 1939 as well as in 1950. In his report relative to his examination of Elliott in 1950, Dr. Drayton reported that he not only examined him, but he read all the notes of testimony, some of them twice, as well as examined the court records. Dr. Drayton stated that defendant was a middle grade moron, and that he was mentally defective and a fabricator of the first water. He likewise found that he had a certain amount of native shrewdness and showed no evidence of being mentally ill.

There is no contention by defendant or by his counsel that he was insane.

After the death sentence was imposed, counsel for defendant filed a petition to incorporate certain records showing defendant's history and his examination by other psychologists and psychiatrists; and likewise petitioned the Court to vacate the sentence. The sentencing Court granted the petition and heard and studied all the evidence which defendant's attorney so thoroughly and painstakingly presented. The sentencing Court, composed of three judges, was unanimously of the opinion that nothing had been presented to it which would warrant disturbing the sentence imposed.

Defendant contends that because a criminal or murderer is a weak, unstable, aggressive, dangerous

moron who is mentally deficient the sentencing Judge or Court (1) must consider his record during his entire life and particularly reports of every psychologist and psychiatrist who has examined him, and (2) must be *controlled* by these reports and impose a sentence in the case of murder in the first degree not higher than life imprisonment. This contention carries the theory or doctrine of "diminished responsibility" to an extreme and would vest in a psychiatrist and not in the Courts the right and power to determine and fix punishment for crimes. Such a theory or philosophy would soon transfer the punishment of criminals from Courts to psychiatrists and would inevitably result in a further breakdown of law enforcement and eventual confusion and chaos Fortunately our cases are opposed to such an undesirable result.

Section 701 of The Penal Code, Act of June 24, 1939, P.L. 872, 18 P.S. 4701, provides: "In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, *at its discretion,** impose sentence of death or imprisonment for life." The evidence must of course be sufficient to establish the crime of murder in the first degree and there must be evidence in the record indicating that the discretion vested by the Act in the Court below was judicially exercised: *Commonwealth v. Givens,* 363 Pa. 141, 69 A.2d 142; *Commonwealth v. Howell,* 338 Pa. 577, 13 A.2d 521; *Commonwealth v. Taranow,* 359 Pa. 342, 59 A.2d 53; *Commonwealth v. Hough,* 358 Pa. 247, 56 A.2d 84. In *Commonwealth v. Givens,* 363 Pa., supra, speaking through Mr. Justice PATTERSON, we said (page 147): "The court below having determined in the exercise of its statutory discretion that the extreme penalty shall be imposed, the question on appeal is not whether this Court would have imposed the death

---

* Italics throughout, ours.

penalty, but whether the discretion reposed in the court below was judicially exercised: Commonwealth v. Howell, 338 Pa. 577, 580, 13 A. 2d 521. It does not lie within our province as an appellate court to attempt the imposition of a fixed and immutable standard upon trial courts for the guidance of their discretion in discharging their statutory duty in this regard: Commonwealth v. Samuel Jones, 355 Pa. 522, 534, 50 A.2d 317; Commonwealth v. Taranow, 359 Pa. 342, 346, 59 A.2d 53. So long as the ingredients necessary to constitute murder in the first degree are present and the penalty imposed is in keeping with the alternatives authorized by the statute, this Court is without authority to act, unless it plainly appears that the court below erred in overlooking pertinent facts, or in disregarding the force of evidence, or erred in its law: Commonwealth v. Hawk, 328 Pa. 417, 422, 196 A. 5." To this we add that this Court has also the power to modify and reduce a sentence of death to life imprisonment where there has been a manifest abuse of discretion in the imposition of the penalty: *Commonwealth v. Garramone,* 307 Pa. 507, 161 A. 733; *Commonwealth v. Irelan,* 341 Pa. 43, 17 A. 2d 897; *Commonwealth v. Hawk,* 328 Pa. 417, 196 A. 5; *Commonwealth v. Taranow,* 359 Pa., supra.

Where a defendant is legally sane, a trial judge may, upon application or upon his own initiative, secure a mental examination of the defendant ". . . *to guide the judge* in determining what disposition shall be made of the defendant": Section 1, Act of May 2, 1933, P.L. 224, 19 P.S. 1153.* The law does not require the Judge to be controlled, absolutely or otherwise, by the report of the psychiatrist, but merely requires the Judge to consider such report as a guide in his determination of the sentence; and the trial Judge or Court may make

---

* Since the time that the defendant in this case was sentenced this statute has been repealed.

its own appraisal of the defendant's mental capacity or moral responsibility, his history, education, mentality and background and what the appropriate punishment or sentence should be, based upon the facts of the crime and all of the evidence presented as well as its observations at the trial: Cf. *Commonwealth v. Frisbie*, 342 Pa. 177, 20 A. 2d 285; *Commonwealth v. Pepperman*, 353 Pa. 373, 45 A. 2d 35; *Commonwealth v. Howell*, 338 Pa. 577, 13 A. 2d 521.

Counsel for defendant has incorporated into the record many reports as to the activities and mental condition of the defendant from the time he was 10 years old. We have carefully studied these reports and (what is unusual) find them to be practically unanimous. They apparently agree that the defendant was an aggressive, unstable, dangerous moron who was mentally defective—some considered him a high grade moron and others a middle grade moron.

There is no evidence that the trial Judge or sentencing Court overlooked any pertinent facts or disregarded the force of any evidence or erred in applying any legal principles or law, nor do we find any abuse of discretion in imposing the death penalty.

We conclude that there is no merit in any of the defendant's contentions.

Judgment and sentence affirmed.

Mr. Justice JONES concurs in the result.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO, June 24, 1952:

I dissent from the affirmance of the lower court's decision, not because I minimize the seriousness of the terrible crime committed by the defendant, but because I apprehend the imposed penalty was one directed to the offense and not to the offender.

There is no punishment in the scale of justice heavy enough to make atonement for what Theodore Elliott did, but for what Theodore Elliott is, a different scale, it seems to me, must be used. Punishment is to be applied according to the capacity of the individual, as well as to the enormity of the delinquent act.

The defendant here is a mental defective with a long record of abnormal conduct. On February 27, 1937, he sustained a head injury and two years later hospitalization was recommended for "therapeutic encephalography." The diagnosis made on November 22, 1939 was "middle-grade moron cerebral trauma."

An out-and-out insane person is never executed, even though he burn down a city. If an insane multiple slayer is saved from death or even not punished at all except to be restrained of liberty on account of his dangerous character, any nearness to mental irresponsibility must also receive consideration on the basis of avoidance of the death penalty.

If Elliott's mental irresponsibility was such as to decrease his free choice of action, might that margin of irresponsibility not be enough to explain the ferocity of the killing, which fact seems to be the principal basis for the lower court's imposition of the death penalty?

One of the judges of the lower court indicated from the bench that a sentence of life imprisonment is not to be regarded as a lesser penalty than that of death. I challenge that statement categorically. It can be stated as a universal truth stretching from nadir to zenith that regardless of circumstances, no one wants to die. Some person may, in an instant of spiritual or physical agony express a desire for death as an anodyne from intolerable pain, but that desire is never full-hearted because there is always the reserve of realization that the silken cord of life is not broken

by a mere wishing. There is no person in the actual extremity of dropping from the precipice of life who does not desperately reach for a crag of time to which to cling even for a moment against the awful eternity of silence below. With all its "slings and arrows of outrageous fortune," life is yet sweet and death is always cruel.

In view of the fact that the defendant pleaded guilty to murder and the court fixed the degree of murder at first degree, the whole and only issue left for determination was that of life imprisonment as against death. What, therefore, was meant by the following colloquy?

"Judge CARROLL: May I interrupt you for a moment? I do not consider a change in a sentence from the electric chair to life imprisonment a reduction in sentence.

Mr. Winkelman: May I say in reference to that—

Judge CARROLL: You do not have to answer it. I just want you to orient yourself to the way some of us think."

The learned Judge who thus spoke might philosophically assume that the suffering of daily incarceration for the remainder of one's existence would in its cumulative misery exceed the momentary pain of electrocution, but this personal philosophy he cannot force on another who still prefers awakening daily into a living world with its never-ceasing song of hope. To the extent, therefore, that one of the three judges who passed on the awesome question of life or death, actually believed that the mold of the grave was no grimmer than the cold of a cell, to that extent his participation in the consideration of the appropriate penalty for the defendant at bar was of no worth whatsoever. His conclusion was unfortunately verified by his further remark from the bench that he did not care to look at

clinical reports from the hospital in which the defendant had been treated.

The report in question was one from St. Luke's and Children's Hospital which told of the defendant's head injury on February 9, 1937. One item reads: "2-23-37, an incision was made over the left frontal area and drainage established."

Another item read: "3-22. incision in parietal region about 3 to 4 inches above frontal incisions to allow through and through drainage."

Excerpts from other clinical reports reveal the following entries: "In the past sixteen months this boy has advanced but six months in mental age and his intellectual inferiority is now very apparent. It is unlikely that he will make much further progress for he shows no capacity for intelligent reasoning nor for mastering new ideas. He is childish, irresponsible, and easily led, with very superficial ideas of moral values." November 10, 1939.

"Boy easily led. Associated with bad group of boys. Boy mentally defective, extraverted and hyperactive and activities with knives lead to conclusions that he is dangerous * * *.

"Volunteers symptoms of cerebral trauma, headaches and noises. Had had a head injury in February, 1937 * * *.

"The recommendation: hospitalization and therapeutic encephalography.

"Diagnosis: middle grade moron: cerebral trauma. I. Q. 68." November 22, 1939.

"NEURO-Psychiatric Clinic
House of Detention
Chron. Age: 15 Yrs. 9 mons.
Mental Age: 9 Yrs. 9 mons.
IQ. 66" October 15, 1946.

"Re-Examination—
10-15-42 Report of
Psychiatrist:

This boy is mentally deficient, and now rates, reacts, and reasons on a middle-grade moron basis. He is quiet, but is slippery, evasive, insincere. He is not to be trusted at all, and he is set on a dangerously lawless life. Has not profited by Glen Mills. His record is long and significant. In it are at least two knife episodes, and now comes implication in armed hold-up. RECOMMEND-Huntingdon.

Diagnosis: Middle-Grade Moron
Constitutional Psychopathic
Inferior
D. G. Davidson, M. D.,
Psychiatrist"

"From Medical report of Dr. David J. Boon of 8-4-38

1. Dr. Weber: persistent headache and history of fractured skull three years ago, with a penciled notation 'No Fracture.'

From 'House of Detention Investigation of 5-31-36' —First episode—at that time, Mrs. Elliott said 'keep the boy locked up until God calls him if he gets in any more trouble.' "

Perhaps if the authorities had followed up the defendant's mother's recommendation, the dreadful murder which brought about this case would not have occurred. However, speculation as to what might have happened is futile. We are confronted with the precise question as to whether a young man whose vision in life has been curtained by cerebral darkness should be held to the same degree of responsibility as one into whose brain falls the clear daylight of unclouded reason.

Mr. Justice LINN in the case of *Commonwealth v. Stabinsky*, 313 Pa. 231, 238, quoted with approval a statement from Grasset, "The Semi Insane and the Semi Responsible": " 'Diminished responsibility is a scientific fact, scientifically established and capable of being analyzed.' "

We may, as we indeed do, look with horror upon Theodore Elliott's deed, but if the measure of the penalty is to equal and not exceed the measure of responsibility, it can scarcely be said, in the light of modern penology, that Elliott can only expiate his crime in the electric chair.

The court below properly said: "There were no economic pressures which excited this lust for crime. His work record was steady; his earnings adequate. We have searched his history carefully for some justifiable explanation. We have none, only a depraved, cruel, ruthless and brutal individual."

The failure to find an explanation for this depraved and brutal crime is the very thing which argues for the defendant's diminished responsibility. Of course, if a tiger is to be killed simply because it is a tiger, then discussion in a case of this character is superfluous. But if in ascertaining the reasons and causes which make a man-tiger, we find a moral responsibility which does not keep pace with the bestial development, we are charged with the duty of considering whether that failure in moral capacity should not soften the blow of the iron hammer of retribution.

Theodore Elliott is a dangerous creature and must be restrained, as the tiger is restrained. Life imprisonment would do this. If it could be shown that Elliott had a freedom of selection as to the shape of his head and the brain that went into it and also had the free choice as to whether his brain should be jolted by the force of an automobile blow, then no one could rea-

sonably challenge the law and society in taking its ultimate toll. But since Theodore Elliott did not have that choice, I believe, and I say this with the utmost deference to those who, in the conscientious discharge of their duty, think otherwise, his life should be saved.