## Commonwealth v. Cater et al., Appellants.

Argued May 2, 1958. Before Jones, C. J., Bell, Musmanno, Arnold, Jones and Cohen, JJ.

reargument refused July 2, 1959.

*W. Bradley Ward,* with him *Joseph L. Ehrenreich,* for Cater, appellant.

*Charles A. Lord,* with him *Leon Rosenfield,* for Williams, appellant.

*Garfield W. Levy,* with him *Irwin Apfel,* for Rivers, appellant.

*Juanita Kidd Stout,* Assistant District Attorney, with her *James N. Lafferty,* First Assistant District Attorney, and *Victor H. Blanc,* District Attorney, for appellee.

Opinion by Mr. Justice Cohen, May 8, 1959:

On the evening of March 26, 1957, three young men planned and perpetrated a robbery at the pharmacy of Jacob Viner, a North Philadelphia druggist. One of the robbers accompanied Viner to the rear of the establishment, and after warning the druggist to "shut-up," shot and killed him in the presence of his wife. The pharmacy's cash register was rifled of some $34 and the trio made good their escape.

Subsequently, James Cater, Robert Lee Williams, and George Lee Rivers, the appellants herein, were arrested and indicted for the murder of Viner. All three, confessing to their participation in the crime, entered pleas of guilty to murder generally, whereupon the trial court adjudged each to be guilty of murder in the first degree. To guide the court's determination of the punishment to be imposed, counsel for the defendants presented evidence describing the defendants' background. Rivers, age 18, Cater, age 19, and Williams, age 20, were reared in unstable homes under unfavorable socio-environmental conditions. Each had made only minimal scholastic progress, and, according to a report of a psychiatrist, Rivers was not only mentally deficient but also mentally ill. After deliberation upon the entire record, the trial court sentenced each defendant to death in the electric chair.

Appeals of the defendants originally filed in this Court were discontinued by their counsel in order that applications might be made to the Board of Pardons for commutation of sentences without the risk that the record before the Board would be further prejudiced by this Court's affirmance of the sentences. However, when the matter was presented to the Board, that body, being evenly divided, refused the applications.

Thereafter petitions were filed in this Court to reinstate the appeals. We issued rules to show cause

why the appeals should not be reinstated, and, after argument thereon, we made the rules absolute.[1] We now consider the merits of those appeals.

Appellants do not except to the judgments of murder in the first degree by the court below. Nevertheless, we have reviewed the record and conclude that the court's determinations of the degree were proper.

Under the "felony-murder" rule, when one person kills another in the perpetration of a common law felony, the element of legal malice is supplied to the homicide so as to make the homicide a murder. If the felony is one of the class enumerated in Pennsylvania's "degree of murder" statute, such as robbery, the murder becomes one of the first degree.[2] Accordingly, in the present case Williams, the defendant who actually committed the act, was guilty of murder in the first degree. And since, by operation of the "co-conspirator's rule", the acts of one principal which are in furtherance of the common, unlawful design are attributable to each of his co-felons, Cater and Rivers, the other participants in the drugstore robbery, were equally responsible with Williams for the homicide.[3]

The sole and important issue presented by these appeals is—did the court below err in sentencing each defendant to death?

Much attention has been given the subject of capital punishment in recent years by legislatures,[4] and legal

---

[1] We are of the opinion that an application for executive clemency is proper only after all avenues for judicial review and redress have been exhausted. Therefore, we do not propose in the future to permit appeals taken to this Court in capital cases to be withdrawn so that recourse may be had to the Board of Pardons.

[2] Act of June 24, 1939, P. L. 872, §701, 18 P.S. §4701.

[3] See *Commonwealth v. Redline*, 391 Pa. 486, 137 A. 2d 472 (1958).

[4] The State of Delaware has recently abolished the death penalty. On the other hand, the voters of the State of Oregon de-

scholars.[5] The thorough examination and consideration of the questions raised by the death penalty had been discussed at length and even though many authorities,[6] do not feel that the death sentence accomplishes the traditionally claimed objectives of protecting society or the deterring of potential offenders, still it is not our duty nor our privilege to alter the standards that have been established by the legislature.

In 1925 the General Assembly repealed the mandatory death penalty for first degree murder and substi-

feated by a small margin a proposed amendment to the State Con stitution repealing the provision therein fixing the death penalty as the punishment for first degree murder.

[5] See, e.g., Wechsler, The Challenge of a Modern Penal Code, 65 Harv. L. Rev. 1097, 1124 (1952); Symposium, Murder and the Penalty of Death, 284 Annals. (1952); Report, Royal Commission on Capital Punishment, 1949-1953 (1953).

[6] "The report of the Royal Commission led to a much wider knowledge in this country of the relevant facts and to an increase in the demand for the abolition of capital punishment. Many people here had not realized before that outside British territory the only civilized countries in the Western World which retain capital punishment are France, Spain and some of the United States, and that all other countries regard the imposition of death as a form of punishment both unnecessary as a deterrent and an anachronistic barbarity. Nor had they realized that the universal experience of abolitionist countries had been that the abolition of capital punishment does not in fact result in any increase in the homicide rate. . . .

"Most political observers are of the opinion that, whatever political party is returned to power at the next General Election, the next Parliament will abolish the remains of a punishment which an increasing number of people feel cannot be shown to be necessary as a deterrent and no longer accords with the degree of civilization to which we feel we have attained." Gerald Gardiner, Q. C. (Chairman of the General Council of the Bar of England and Wales). Capital Punishment in Britain, 45 A.B.A.J. 259, 260-261. (1959).

tuted in its place the present provision for the punishment of first degree murder: "In cases of pleas of guilty, the court, where it determines the crime to be murder of the first degree, shall, at its discretion, impose sentence of death or imprisonment for life."[7]

It should be made clear, however, that "the legislative question whether capital punishment shall be abolished or retained has not been transferred from the lawmakers to the courts; the law still is that the death penalty shall be imposed in proper cases and on the merits of each case. . . ." *Commonwealth v. Ritter*, 13 Pa. D. & C. 285, 288 (1930). But, it should be equally clear that the penalty of death is not to be pronounced routinely in cases of first degree murder; solemn deliberation and careful analysis should precede the determination to make use of this penalty so that life will not be taken needlessly. Beyond this, the legislature has confided broad and absolute discretion to trial courts to decide the sentence to be imposed upon a defendant guilty of murder of the first degree: "This is as it should be, and in cases of murder of the first degree there is a special reason for the legislature's omission to classify them upon the basis of the penalty to be imposed, which is apparent. The solemn and awesome choice between life and death could not fairly or safely be committed to any man or body of men, upon any other terms. Otherwise it would not be choice at all. It must be left wholly to the conscience and unfettered judgment of the tribunal charged with the responsibility of deciding whether in the public interest, and in the light of the facts of the particular case before it, the crime merits the supreme penalty of death." *Commonwealth v. Levin*, 66 Pa. D. & C. 55, 61 (1949).

---

[7] Act of May 14, 1925, P. L. 759, now incorporated in The Penal Code, Act of June 24, 1939, P. L. 872, §701, 18 P.S. §4701.

And, it is doubtful that the courts could set forth any satisfactory set of standards even if they were disposed to do so.

This is the reason why this Court has said time and again that there are no fixed and immutable standards to be established to guide trial courts in exercising their discretion.[8] It is the reason why we have held that a trial court imposing sentence for first degree murder is not under a duty to impose the death penalty even in the absence of mitigating circumstances or in the presence of aggravating circumstances. *Commonwealth v. Hough,* 358 Pa. 247, 251, 56 A. 2d 84 (1948). The steadfast refusal of this Court to limit in any respect the discretion in sentencing given a trial court is in accord with the prevailing American view. The courts of last resort in the States which have first degree murder statutes similar to or identical with that of this Commonwealth have also uniformly declined to supply rules or standards.

We recognize, of course, the dangers in confiding the choice of sentence in cases of first degree murder to the unfettered discretion of the trial court. Such a procedure affords an opportunity for non-uniform, discriminatory and arbitrary results,[9] and perhaps cases can be shown where particular judges in imposing sentence have succumbed to such extraneous influences as newspaper tirades against "soft justice."

All in all, allowing the determination of the sentence to be imposed in capital cases to remain exclu-

---

[8] *Commonwealth v. Elliott,* 371 Pa. 70, 76-77, 89 A. 2d 782 (1952) ; *Commonwealth v. Givens,* 363 Pa. 141, 147, 69 A. 2d 142 (1949) ; *Commonwealth v. Samuel Jones,* 355 Pa. 522, 534, 50 A. 2d 317 (1947).

[9] 1 Sir Samuel Romilly's Speeches, 116-136 (1820) ; Hartung, Trends in the Use of Capital Punishment, 284 Annals 8, 14-16 (1952).

sively within the discretion of the trial courts has worked well and we will not substitute our discretion for that exercised by the lower court unless we are or society will be shocked by our failure so to do. Indeed, the Royal Commission has recommended this system for adoption in Great Britain with the statement: "if capital punishment is to be retained, and at the same time the defects of the existing law are to be eliminated, this is the only practicable way of achieving that object." Report, Royal Commission on Capital Punishment 1949-1953, 207-208, 214 (1953).

It must not be thought, however, that this Court in adopting such a policy has abdicated its duty to review sentences imposed in first degree murder cases. On the contrary, while we do not substitute our judgment for that of the sentencing court, we look to see in every capital case whether the trial court abused its discretion by overlooking pertinent facts or disregarding the force of evidence, or erred in its law. *Commonwealth v. Givens*, 363 Pa. 141, 69 A. 2d 142 (1949) ; *Commonwealth v. Hawk*, 328 Pa. 417, 196 Atl. 5 (1938).

In applying these criteria to the present case, counsel for the appellants argue that the court below erred in its law in that its members thought themselves under a duty to impose the death penalty in the absence of mitigating circumstances. However, we find nothing in the opinion which indicates that the court entertained such a misapprehension. Indeed, the court recognized that "there is no fixed or immutable standard for the guidance of the court in determining the penalty as between life imprisonment and death."

Counsel for the appellant, Williams, also argues that the court misapprehended certain facts in reaching its conclusion as to the proper sentence to be imposed upon Williams. Counsel declare that there is no evidence to support the court's statement that Williams

had engaged in a "deliberate preparation to kill" or that he was "determined . . . to kill if necessary". But, in view of the fact that Williams was armed for the robbery with a loaded gun, a gun which he used to shoot down Mr. Viner without the slightest provocation, we think that it can fairly be said that Williams was prepared to kill.

It is also urged upon us that the court's statement that Williams was motivated by "aggressive hatred" was not justified by the record. However, the simple truth of the matter is that Mrs. Viner, the witness to the shooting of her husband, testified that "Williams was white with rage" when he fired the fatal shots. We therefore cannot charge the court, on this basis, with an abuse of discretion in passing a sentence of death upon appellant Williams, and accordingly the judgment of sentence as to Williams is affirmed.

As to appellants Cater and Rivers, however, the matter stands in a somewhat different light, and as to these two defendants we find that the court misapplied certain of the evidence in reaching its conclusions as to the sentences to be imposed upon them.

In its opinion, the court *en banc* discussed the culpability of all three appellants together and in so doing inadvertently applied certain statements made in the confession of one of the appellants equally to the others. Thus, the court erred in stating that "all three [defendants] went to Cater's house to procure the gun long before the holdup." The fact is that there is no evidence in the record to support this statement as against either Cater or Rivers. Similarly, the court was mistaken in its belief that as to Cater and Rivers the motive for the crime was "the discharge of aggressive hatred." Again, there is no evidence to support such a characterization.

Counsel for defendant Rivers points to additional erroneous statements prejudicial to Rivers which appear in the opinion of the court below. The court's declaration that defendant Rivers "rifled the register after the murder" is without evidentiary support as is its recital that he "calmly robbed the corpse" and "reloaded the gun." Finally, the court averred that "the crime was preceded by deliberate preparation to rob and to kill," whereas Rivers stated in his confession that plans for the robbery were formulated immediately prior to the commission of the crime without deliberate preparation.

We cannot say that any or all of these factual errors influenced the court below in its decision to impose the death sentence upon both Cater and Rivers. But, we must agree with counsel for these appellants that we cannot say that if the court had properly viewed the evidence it might not have reached a different conclusion as to the appropriate penalty. "Where the scales are poised in such even balance with respect to the choice between life imprisonment and the death penalty, and where the ultimate decision should depend upon fine, sound and discriminating judgment, each fact operates with telling effect, and no one can say, with confidence . . . that any particular fact is of no moment in reaching the final decision." This is particularly true when sentences are being imposed upon more than one participant in a homicide. The distinctions in the evidence applicable to each of the defendants must be rigorously maintained and scrupulously evaluated. In such a solemn and drastic proceeding there is no room for a scintilla of error.

Accordingly, the judgments of sentences of death are vacated as to appellants James Cater and George Lee Rivers, and the records remitted to the court below for re-sentencing. Judgment of sentence of Robert Lee Williams is affirmed.

Mr. Justice BELL and Mr. Justice BENJAMIN R. JONES would affirm the judgment and sentence in each case.