Commonwealth *v.* Cole, Appellant.

Argued September 30, 1955. Before STERN, C. J., STEARNE, JONES, MUSMANNO and ARNOLD, JJ.

*Herbert Blumenfeld,* for appellant.

*Samuel Strauss,* Assistant District Attorney, with him *James F. Malone, Jr.,* District Attorney, for appellee.

OPINION BY MR. JUSTICE MUSMANNO, January 9, 1956:

The details of the murder to which the defendant in this case pleaded guilty are so revolting that no purpose can be served in sullying the printed pages of the State Reports with a narration of the loathsome particulars. It is enough to say that a reading of the record establishes beyond the slightest shadow of even a mist of uncertainty that the facts spell first degree murder under the Criminal Code * and all the decisions of this Court on the subject. Moreover, there is no pretension in the appeal of the defendant that his unhesitant admissions in open court on his plea of guilty do not conclusively prove all the ingredients of first degree murder.

The appeal for a new trial is divided into three parts, which will be taken up seriatim.

1. *Should the defendant have been permitted to withdraw his plea of guilty?*

On December 6, 1954, the defendant appeared in the Court of Oyer and Terminer and General Jail Delivery for Allegheny County. Sitting on the bench were Judges WEISS, NIXON, and ALPERN. The indictment was read aloud to the accused by Court Clerk Mazer, who then questioned him: "How say you—are you guilty or not guilty of the felony for which you stand charged?" The defendant's answer was: "Guilty."

---

* Act of 1939, June 24, P. L. 872, Sec. 701 (18 PS §4701).

In Order that it should be clear as sunlight and as obvious as day that he fully comprehended the nature of the proceedings into which he entered of his own free will, the Court interrogated the defendant as follows: "Judge ALPERN: Q. We want to make certain Mr. Cole, that you understand now, about the plea of guilty? A. Yes, ma'am. Q. Have you made this plea with the full knowledge of the consequences of pleading guilty? A. Yes, I have. Q. Did you discuss the matter, thoroughly, with your counsel? A. Yes, ma'am. Q. Did they urge you to plead guilty, or was it of your own volition? A. They didn't urge me at all. It was of my own. Q. And you know when you are pleading guilty, you are pleading guilty generally? A. Yes. Q. And you have given it consideration and nobody has told you? A. No, ma'am. Judge NIXON: Q. Mr. Cole, I want to be sure you arrived at this conclusion yourself? A. Yes, sir. Q. Without the influence of anybody else? A. Yes, sir. Q. And you realize what you are doing, pleading guilty to murder? A. Yes, sir. Q. And that this court has the responsibility, on your plea, to fix the punishment? That is, the responsibility of this court, there being no arrangements made by this court or anyone else, that by pleading guilty, the sentence of this court would be lenient or not lenient, and in accordance with the facts as presented. Is that right? A. Yes. Q. Under our responsibility, this court has to fix the degree of the crime, do you understand that? A. Yes. Judge ALPERN: Q. Do you know you have a right to a jury trial? A. Yes. Q. And you do not choose to have a jury trial? A. No."

When the defendant was arrested, six months prior to appearing in Court, he voluntarily made a written statement in which he related minutely how he strangled to death his victim Pearl Williams. Now, in open Court, after he had testified to the events which

occurred at the time of and preceding the murder, his written statement was physically handed to him and he was invited to read it. He devoted 33 minutes to studying the document, whereupon Judge ALPERN questioned him: "Judge ALPERN: Q. Mr. Cole, we have given you twenty minutes, and as much other time as you would want to examine Commonwealth Exhibit 16, which represents a voluntary statement made by you to Captain Flynn at the time of this very serious crime. I am asking you now, at 12 o'clock, whether the facts contained in that statement, or whether the statement made by you at that time, was voluntarily made by you to the Police Department? A. Yes. Q. And does Exhibit 16, accurately report what you stated to Captain Flynn? A. Yes. Q. The questions appearing, and asked you? A. Yes. Q. And the answers appearing are the answers you gave? A. Yes. Q. And you made the statement of your own accord, without any duress or force by the Police Department? A. Yes. Q. You have read each page, and have had ample time to read it? A. Yes. Q. And have you had sufficient education to understand everything you read? A. Yes."

Throughout the entire prosecution the defendant was represented by two able and experienced counsel who had been appointed by the Court at the defendant's own request. The zeal and competence with which these lawyers championed the defendant's interests were beyond reproach and responded to every requirement in the best traditions of the criminal bar. Notwithstanding counsel's devotion to his welfare, the defendant petitioned the Court two months after the hearing to be permitted to withdraw his plea of guilty, claiming that his attorneys had persuaded him to plead guilty. Paragraph 8 of the petition reflects its tenor and purport: "That your petitioner entered a plea contrary to his own desires and inclination; he was persuaded by coun-

sel to plead guilty; he acquiesced, being promised that he would thereby receive consideration by the Court in fixing the degree of the crime; however, now after great deliberation and thought, your petitioner firmly believes that the degree of his guilt, if any, should be submitted to a jury, and his fate left in their hands."

The Court below found the petition to be without merit. We affirm that finding. It would strain the imagination even of a detective story writer to conjure up a situation where an accused could have more unqualifiedly and uninhibitedly acknowledged his guilt than did William D. Cole. So unreserved were the disclosures of his abhorrent crime that it could seem he experienced gratification in their almost boastful recital. Nor can it be said that he was hurried into court without opportunity to reflect on what he had done, or reconsider what he had said. At least half a year expired between the time of his confession and his appearance in Court, ample time within which to decide whether to affirm or repudiate his admissions. In Court, as already indicated, he corroborated what he had said when first questioned about the crime by the police authorities.

If there were the slightest indication that the defendant was misled, or even without being misled there was substance to his petition to withdraw his plea of guilty, or with or without substance there would be some possibility that a jury on the facts would return a verdict of anything less than first degree murder, there might be some reason to further deliberate on his request. A study of the record, however, establishes beyond any conceivable doubt that the defendant's decision to plead guilty was as self-willed as his confession of the crime and the commission of the crime itself. The determination of this Court to affirm the lower Court's refusal of the petition is not based on any

so-called technicality but upon a deliberative and reflective review which answers every demand of justice.

## 2. Report of Psychiatrists

Defendant's counsel complains that the Court made use of reports submitted by the Behavior Clinic of Allegheny County and Dr. James M. Henninger. The defendant was in no way circumscribed in the presentation of evidence, medical or otherwise. At the hearing before the Court, Assistant District Attorney Samuel A. Strauss, who tried the case for the Commonwealth, said: "I might say this, if the Court please: there is a Behavior Clinic record in this case. Normally, we do not make that a part of the record. I don't feel it should be made part of the record until the Court makes a finding as to the degree in this case. At that time, I do feel that it should be made part of the record in this case, because it is available to the Court, and it will be considered by the Court, and therefore, should be made part of the record ultimately if the occasion arises."

Upon request to the Court, the defendant and his counsel would have been entitled to see this report and to question the doctor responsible for it. No attempt was made on behalf of the defendant to see or make any inquiry regarding the report until the date fixed for the imposition of sentence.

It is to be noted that the reports of the Behavior Clinic and the psychiatrist were not presented by the Commonwealth but were obtained by the Court. However, we do not intend by this decision to hold that a defendant is to be denied opportunity to examine reports and to question those responsible for them simply because they were called for by the Court instead of having been presented ex parte by the Commonwealth.

We have scrutinized the reports and are satisfied that the defendant's rights were not prejudiced by the Court's consideration of those reports.

### 3. *Death Sentence*

Under Sec. 701 of the Criminal Code of June 24, 1939, P. L. 872, 18 P.S. 4701, where a defendant pleads guilty to murder, the Court determines the degree of homicide, and if it finds the defendant guilty of murder in the first degree it determines in its discretion whether a sentence of death or life imprisonment is indicated. The province of the appellate Court is to review the record and decide, where the death sentence has been imposed, if the Court below abused its discretion. Of the three judges who sat on the case Judges WEISS and NIXON voted for the death penalty.* Judge ALPERN recommended life imprisonment.

The record demonstrates beyond the peradventure of a doubt that the defendant is a man scornful of the law and addicted to crime, that he is a criminal mired in depravity, debased in sadism, and hostile to the most elemental standards of decent society and moral conduct. Judge WEISS, writing the Opinion for the Court below, said of the defendant: "An examination of his criminal record reveals that on August 17, 1946 he was convicted of felonious assault and battery and sentenced to imprisonment for six months to one year in

---

* The writer of this Opinion, living in the same community with Judges WEISS and NIXON, has had a long association with them in the legal, civic, and social world. It is his observation that it would be difficult to find judges who are more kindly disposed to mankind generally and who might be possessed of more easily moved impulses in behalf of erring humanity. Certainly the defendant in this case could not complain that his case was heard by judges inclined by temperament, background, or sociological outlook to regard the imposition of maximum penalties lightly or without long and grave consideration. It is the writer's belief that only a murder committed under the most brutal and savage circumstance by a murderer bearing a record indicative of hopeless social regeneration would impel the conscientious and able judges in the Court below to impose the ultimate penalty.

the Allegheny County Workhouse. On February 19, 1947 he received a suspended sentence on a charge of larceny; but on March 7, 1947, he was recommitted to the Workhouse for parole violation. Defendant was arrested for assault and battery on February 13, 1948, subsequently convicted and sentenced to six months in jail. On February 18, 1949 he was convicted of assault and battery with intent to ravish upon Loraine Smith, a twelve-year old child. In conjunction with this offense, he was also convicted of burglary but received a suspended sentence because of the sentence imposed on the assault and battery with intent to ravish charge. This crime, it should be pointed out, consisted of facts strikingly similar to the facts of the present case.

"Such a series of convictions evinces a character predisposed to crime and properly speaks of defendant as a hardened criminal. Although Cole was sentenced to imprisonment in the Western State Penitentiary for 2½ to 5 years on this latter offense, he was compelled to serve the maximum term because of his poor institutional record. His misconduct while in prison consisted in throwing scalding water in the face of another inmate, the striking of another inmate over the head with a chair, and in threatening to kill another person on release.

"Further, in 1949 the Behavior Clinic of this county, comprised of two eminently qualified psychiatrists, examined William Cole pursuant to an order of court in relation to the assault upon Loraine Smith, as is customarily done in all sex cases. The following report was submitted summarizing their conclusions: 'February 16, 1949: This subject has had a bizarre type of behavior which dates back to early adolescence and has resulted in numerous arrests. He was known to Juvenile Court and was sent to Morganza, but has not

profited by experience. He drinks to excess even to the point of amnesia. He has had only sporadic employment and associates with individuals of the lowest type. He is aggressive, sadistic, given to acts of violence and even homicidal. His tests and clinical evaluation suggest the diagnosis of Psychopathic Personality and an offense of this type is consistent with his personality make up. He is not psychotic or commutable to a mental hospital and for the best interests of all concerned, we would suggest the longest possible sentence.'

"After the defendant's arrest for the present crime, the Behavior Clinic made another similar examination. The concluding paragraph of the detailed report relating the conclusions of this examination reads as follows: 'June 7, 1954: There is no penance possible for persons of this kind. Punishment has no individual valuation. Therefore, one does not expect, nor could I find, any contrition or remorse in stating his guilt. Therefore, no hospital or prison can rehabilitate or make socially acceptable a human type like William Cole. Social isolation should have been his lot before this.'

"These reports speak for themselves.

"Certainly the facts of this case reveal a depravity seldom seen in criminal defendants, and it is significant that no evidence was brought to the attention of the Court indicating any facts in extenuation of the crime. Where a murderer has a record of crimes of violence, or a homicidal tendency, or indicates a savage and hopelessly anti-social nature, considerations of restraint may demand the severest penalty. This Court does not believe in the biblical phrase of an 'eye for an eye' or a 'tooth for a tooth' or a 'life for a life.' There may be circumstances that justify or mitigate a killing. This case is devoid of any such circumstances. The defendant has proved by his past dereliction to be a

menace to society from without, and dangerous to his fellow inmates from within prison."

Judgment affirmed.