## Commonwealth *v.* Leamer, Appellant.

486

Argued September 24, 1956. Before Stern, C. J., Jones, Bell, Chidsey, Musmanno and Arnold, JJ.

*Richard A. Carothers,* with him *Gerald S. Turner,* for appellant.

*Park H. Loose,* District Attorney, with him *Frank B. Warfel,* First Assistant District Attorney, for appellee.

Opinion by Mr. Justice Arnold, November 12, 1956:

Before the court without a jury, defendant pleaded guilty to an indictment charging him with murder.

After taking testimony which included confession of the crime, the court below determined that it was murder of the first degree and imposed the death penalty. On this appeal he admits that the court properly found him guilty of murder of the first degree, but contends that because of his background of "emotional instability" the court erred in not limiting the penalty to life imprisonment.

Section 701 of the Penal Code of 1939, 18 PS §4701, provides that where the court below "determines the crime to be murder of the first degree, [it] shall, *at its discretion*, impose sentence of death or imprisonment for life"; and we have held that unless we find an abuse of that discretion we will not reduce the sentence from death to life imprisonment: *Commonwealth v. Gossard*, 383 Pa. 239, 117 A. 2d 902; *Commonwealth v. Thompson*, 381 Pa. 299, 113 A. 2d 274. "No hard and fast rule as to what proof is sufficient for this purpose [imposition of life imprisonment rather than the death penalty] can be laid down, but the circumstances of each case must be considered as a whole and the determination permitted to rest in the sound discretion reposed by statute in the court below": *Commonwealth v. Thompson*, 381 Pa. 299, 303, 113 A. 2d 274. In fullest compliance with the requirements of the Act of February 15, 1870, P. L. 15, 19 PS §1187, we have painstakingly examined this record, and we find no justification for reversal.

On the evening of November 2, 1955, the defendant, then 30 years of age, went to the home of his grandfather, aged 92 years, with the avowed purpose of robbery. Failing to gain entrance by prying several other windows with a screw driver, he finally forced open the window of the bedroom in which his grandfather was sleeping. He "called to him a couple of times to

see if he was there or not"; and stated the reason for doing so as follows: "Well, I figured that was the only way—I wanted to see if he was there, and then it was either forget about it, or else I had to kill him, if he knew I was there—if I could have got in without him hearing me, and I was in there robbing him or something, and he found that out, I would probably have to kill him anyway." Upon receiving answer from his grandfather, he asked him to come out to his car to see an albino deer. They walked out, and as they did so, defendant struck his grandfather on the head with a 3/4″ pipe, about five inches long. As he was falling to the ground, still conscious, the victim "grabbed hold of [defendant's] . . . coat and pulled [him] . . . down with him, and got his hand around my neck a little, not enough to amount to anything." Defendant then "started to choke him . . . hit him a couple of times more . . . until I didn't think he was breathing." Thereupon he removed the victim's pocketbook and a key from his trousers; left him on the ground, to return to the house and search for money. The only items he found and removed were approximately $17.00 from the pocketbook, the victim's watch and flashlight. He then placed the victim in his car, drove the body to a quarry hole filled with water and threw him into the hole.

Upon apprehension, defendant gave a full and free confession, and aided the officers in obtaining the articles taken from the victim and which he had hidden to escape detection.

The only proof of "emotional instability" was supplied by his mother and a neighbor. Their testimony was to the effect that at twelve years of age he had to leave the eighth grade of school because of St. Vitus Dance; that he had had scarlet fever at the age of five,

which disease "left his heart in a weakened condition and his nerves bad"; that he developed a curvature of the spine, which prevented his doing heavy work and thus until the crime he could not retain steady work; that he was affected by spells during which he "would just pass out, he would not know anything, . . . and lots of times he would lay for a day at a time . . . just as if he was laying dead"; intermittently he received public assistance; that he was under great tension when living in his parents' home because of his father's drunkenness and "rough treatment received from his father"; that upon his discharge from the army, where he served approximately three years, "he was sort of despondent . . . , would not laugh or joke like he did before."

It is significant that no medical testimony was offered on behalf of defendant, even though this is not necessarily the determining factor in the case. However, before testimony taken, by order of the court he was given a full examination by a commission to determine sanity. It is also to be noted that he was not intoxicated at the time of commission of the crime; that his confession was free and full as to every detail; that, as declared by the court, "During the taking of the testimony he was anything but dull and apathetic . . . was alert and interested in the proceedings and listened carefully and intently to all of the testimony"; and that he showed no remorse over the crime.

The record not only fails to establish emotional instability mitigating the crime, but, as we held in *Commonwealth v. Bibalo,* 375 Pa. 257, 263, 100 A. 2d 45, "the court was not required as a matter of law to reduce the sentence from death to life imprisonment merely because the defendant was unstable and either a moron or a mental defective." See also *Common-*

*wealth v. Elliott,* 371 Pa. 70, 89 A. 2d 782; *Commonwealth v. Gossard,* 383 Pa. 239, 117 A. 2d 902. His acts were wholly inexcusable, viciously planned and carried out, and his testimony brought forth nothing which would permit us to find an abuse of discretion. Cf. *Commonwealth v. Cole,* 384 Pa. 40, 119 A. 2d 253.

As a mitigating circumstance in this case, defendant refers to the fact that the district attorney did not ask for the death penalty. But as we held in *Commonwealth v. Lowry,* 374 Pa. 594, 98 A. 2d 733, even where a district attorney asks for penalty of life imprisonment a jury may disregard the recommendation. In this case the district attorney was silent as to his desires in this regard.

The judgment of sentence is affirmed.