Commonwealth *v.* Tomlinson, Appellant.

242

[redacted]

Argued January 7, 1971. Before BELL, C. J., JONES, EAGEN, O'BRIEN, ROBERTS, POMEROY and BARBIERI, JJ.

[redacted]

*Peter J. Verderame* and *Samuel G. Moyer,* for appellant.

*Stephen B. Harris,* Assistant District Attorney, with him *Ward F. Clark,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. CHIEF JUSTICE BELL, December 20, 1971:

On July 15, 1966, Lucy T. Husvar was found dead in her apartment in Bristol, Bucks County. Appellant Francis Lynn Tomlinson, Jr. was arrested and indicted for the murder, as well as for rape, arson, burglary, robbery by violence, robbery, larceny and receiving

stolen goods. Appellant was brought to trial on the murder indictment and, while represented by counsel, pleaded guilty. A three-Judge panel, consisting of Judges BODLEY, BIESTER and SATTERTHWAITE, found appellant guilty of murder in the first degree, and fixed the penalty at life imprisonment.

We shall set forth the evidence, including appellant's own testimony, which established the sordid facts in this case. On the afternoon of July 15, 1966, Lucy T. Husvar left her place of employment at approximately 4 o'clock and purchased some groceries and Salem cigarettes at a local grocery store. At approximately 8:15 that evening, a long-time friend called at the victim's home, and after receiving no response to his knock at the front door, went to the rear of the house where he observed smoke coming through a basement window. He alerted the neighbors and a fire alarm was sounded. Several of the neighbors broke the locked door at the front of the building and went to the cellar steps, where they saw "a ball of flame" coming from the bottom of the cellar steps. They doused the flame with water and immediately discovered that the flame and smoke had emanated from a pillow which had been placed over the face and head of the deceased victim at the bottom of the cellar steps.

The police investigation revealed that the victim's nude body was found at the bottom of the cellar steps with her pedal pushers and panties around her right ankle. The victim's house and car keys were found on the basement floor by the side of her body and her handbag, with the wallet missing, was found on a kitchen chair. Large quantities of blood were found on the landing at the top of the cellar stairs, and blood and hair samples were present on the baseboards. Blood was also present on each of the stair treads, indicating that the body had collapsed on the landing

and was pulled down the cellar steps by the feet. A bloody latent fingerprint, discovered on the door at the landing area, was proved to be that of the appellant.

The Philadelphia Medical Examiner testified that there were at least ten deep wounds around the head and face and burned tissue on the upper chest and shoulders. Seminal fluid was found in the area of the vagina and thigh. The cause of death, according to the Medical Examiner, was severe head injuries, with contributing smoke inhalation.

A witness identified appellant walking a short distance in the direction of the victim's house shortly after 8 P.M. on the night of the murder. Four other witnesses, including a Catholic priest and a Bristol Township detective, saw and talked with appellant near the scene of the crime between 8:40 P.M. and 9 o'clock P.M. All of these witnesses described appellant as being "quite cool," and not nervous when he identified himself to the four witnesses as the victim's handyman.

At approximately 1:45 A.M., two police officers went to appellant's apartment armed with an arrest warrant and a search warrant. Appellant opened the door after a knock and greeted the police officers with the words, "I've been expecting you." The police officers searched the apartment and their search revealed a shirt with bloodstains and burn marks, as well as trousers and shoes all bearing traces of blood. The bloodstains on the shirt and trousers were analyzed and found to be Type B blood, the same as that of the victim, whereas a blood sample taken from appellant revealed that his was Type A. Charred material was also found in scrapings taken from his shoes. A search of appellant's car revealed a pack of Salem cigarettes and a partly filled can of lighter fluid in the glove compartment.

Appellant was warned of his Constitutional rights, first at the time of arrest in his apartment, and later when he arrived at the police station at approximately 2:45 A.M. Appellant was interrogated by the police for a period of time, during which he made no admissions and denied any knowledge of the crime. At approximately 7 A.M., he asked the police for a pencil and some paper, and stated, "I'd better write this, you'd never believe it if I told it to you." Appellant then handwrote a full confession.

At his trial, appellant, while (we repeat) represented by counsel, changed his plea to guilty, and then took the stand and gave a full statement under oath, which substantially corroborated his handwritten confession. He admitted entering the victim's house, striking the victim with a blackjack, taking the wallet and Salem cigarettes, and raping the victim at the bottom of the cellar stairs. He testified that he put a pillow over the victim's face and tried to suffocate her. Failing in this, he stated that he poured the lighter fluid on the pillow and set the pillow afire in an attempt to insure her death. He also testified that after having taken the money from the victim's wallet, he threw the empty wallet into the nearby Delaware Canal, where it was later found by the police.

Appellant raises three questions in this appeal: (1) was it error for the Court below to admit and consider certain incriminating statements and the written confession made by him in determining and finding first-degree murder beyond a reasonable doubt; (2) was there sufficient evidence to establish murder in the first degree if his incriminating statements and written confession were excluded; and (3) was it error to exclude expert psychiatric testimony on a guilty plea when the Court was considering not the penalty, but the degree of guilt.

The issues raised and the contentions made by appellant are completely devoid of merit.

In *Commonwealth v. Commander*, 436 Pa. 532, 260 A. 2d 773, we set forth the well-settled test for sufficiency of evidence (page 538) : " 'It is hornbook law that the test of the sufficiency of the evidence—irrespective of whether it is direct or circumstantial, or both—is whether, accepting as true all the evidence and all reasonable inferences therefrom, upon which if believed the jury could properly have based its verdict, it is sufficient in law to prove beyond a reasonable doubt that the defendant is guilty of the crime or crimes of which he has been convicted. Commonwealth v. Finnie, 415 Pa. 166, 202 A. 2d 85; Commonwealth v. Burns, 409 Pa. 619, 634, 187 A. 2d 552; Commonwealth v. Kravitz, 400 Pa. 198, 161 A. 2d 861; Commonwealth v. Williams, 432 Pa. 557, 248 A. 2d 301 (1968).' " See also *Commonwealth v. Frye*, 433 Pa. 473, 252 A. 2d 580.

The evidence to prove beyond a reasonable doubt appellant's commission of a willful, deliberate and premeditated murder, as well as a murder in the commission of a felony, was overwhelming. In addition to all the direct and circumstantial evidence hereinabove stated, appellant's own testimony on the witness stand, in which he testified to and admitted virtually all the facts contained in his written confession, proved him unquestionably guilty of first-degree murder.

Appellant next contends that the felony-murder rule should not apply if the intention to perpetrate the felony was not conceived until after the actual killing. There is no merit in this contention. This Court has several times decided that if a homicide occurs in the perpetration of or attempt to perpetrate a robbery or other statutorily-enumerated felonies, a conviction of murder in the first degree will be sustained regardless

of when the design to commit the robbery or other felony was conceived or the felony committed. *Commonwealth v. Slavik,* 437 Pa. 354, 261 A. 2d 583; *Commonwealth v. Wilson,* 431 Pa. 21, 244 A. 2d 734; *Commonwealth v. Hart,* 403 Pa. 652, 170 A. 2d 850; *Commonwealth v. Stelma,* 327 Pa. 317, 192 Atl. 906.

Appellant's next contention is that psychiatric evidence is admissible, in the determination of the degree of guilt,* for the purpose of proving that appellant did not act and was incapable of acting with deliberation and premeditation. This contention is without merit. See *Commonwealth v. Woodhouse,* 401 Pa. 242, 164 A. 2d 98 and cases cited therein; *Commonwealth v. Phelan,* 427 Pa. 265, 234 A. 2d 540; *Commonwealth v. Ahearn,* 421 Pa. 311, 218 A. 2d 561; *Commonwealth v. Tyrrell,* 405 Pa. 210, 174 A. 2d 852; *Commonwealth v. Melton,* 406 Pa. 343, 178 A. 2d 728; *Commonwealth v. Carroll,* 412 Pa. 525, 194 A. 2d 911; *Commonwealth v. Rightnour,* 435 Pa. 104, 253 A. 2d 644; *Commonwealth v. Weinstein,* 442 Pa. 70, 274 A. 2d 182 (where the Court was evenly divided).

Appellant further contends that Pennsylvania's long-established M'Naghten test of insanity should be overruled or, in any event, that the testimony of psychiatrists as to the mental condition and/or insanity of a defendant should be admitted in determining guilt, and not restricted to admission and consideration in determining the penalty.* We disagree with all of these contentions.

In *Commonwealth v. Woodhouse,* 401 Pa., supra, defendant was convicted by the jury of murder in the first degree and punishment fixed at life imprisonment. The only defense was insanity. Two psychiatrists testified for the defense that at the time of the killing and for

---

* Our decisions are unanimous in holding that psychiatric evidence is admissible in considering and determining the penalty.

some time previous defendant was suffering from insanity. A third psychiatrist testified that at times the defendant failed to know the difference between right and wrong. Mr. Justice EAGEN, in a very analytical and exceptionally able Opinion,* reviewed the M'Naghten Rule and sustained it, and pertinently said (pages 250-251, 254, 255, 258-259) :

"It has been stated, reiterated and reaffirmed again and again. In Commonwealth v. Neill (1949), supra, Mr. Justice HORACE STERN, later Chief Justice, speaking for a unanimous court, said at 514: '. . . insanity within the legal meaning of that term, [is] inability, *from disease of the mind,*** to understand the nature and quality of the act and to distinguish between right and wrong with respect to it.'

". . .

"As late as March 16, 1959, Mr. Justice BELL speaking for this Court, said: 'Defendant, as other defendants repeatedly have, asks us to reject or change the rule laid down in M'Naghten's Case, 8 Eng. Rep. 718, which was adopted as the law of Pennsylvania in Commonwealth v. Mosler, 4 Pa. 264. These cases established the so-called "right and wrong" test for insanity, when insanity is raised as a defense by a defendant. Defendant desires us to adopt some undefined psychiatric test. Once more, we refuse to do so. The M'Naghten case rule or "the right and wrong test" has been repeatedly reaffirmed by this Court. . . .': Commonwealth v. Novak, supra, at 210.

"If any rule of law is founded on long established precedent in Pennsylvania, this is it.

". . .

---

* Mr. Justice COHEN. dissented. Mr. Justice MUSMANNO wrote a dissenting Opinion. Mr. Justice BOK wrote a dissenting Opinion, based upon his belief that the M'Naghten Rule should be abolished.

** Italics throughout ours, unless otherwise noted.

"Many psychiatrists, who are very harsh critics of 'M'Naghten,' attack each other's theories even more vehemently.

". . .

" '. . . *If the question of what is a mental disease or defect is a psychiatric one, then the law has abdicated its function of determining criminal responsibility to the psychiatrist and the jury will have to accept the unopposed psychiatric view of mental disease or defect. The test will differ with the prevailing psychiatric winds of the moment'* : State v. Lucas, supra, at 68 (152 A. 2d)."*

". . .

"The protection of society is our paramount concern. . . . Until some rule, other than 'M'Naghten,' based on a firm foundation in scientific fact for effective operation in the protection and security of society, is forthcoming, we shall adhere to it. We shall not blindly follow the opinion of psychiatric and medical experts and substitute for a legal principle which has proven durable and practicable for decades, vague rules that provide no positive standards."

In *Commonwealth v. Phelan*, 427 Pa., supra,** defendant while represented by family-retained counsel pleaded guilty to two murders, and, after a hearing, he was found guilty of murder in the first degree and sentenced to death. He contended, inter alia, that at the time he entered his guilty pleas his mental condition was such that he was unable to comprehend the nature and effect of his acts. The majority Opinion of the Court*** said (pages 278-279) : "During the hearing to determine the degree of guilt, the court refused to admit medical testimony tending to establish that at the

---

* Italics in *Commonwealth v. Woodhouse*.
** Cert. denied by the Supreme Court of the United States.
*** The Court's vote was 4 to 3.

time of the commission of the crimes Phelan lacked the mental ability to form the intent to kill, a necessary ingredient of first degree murder, and lacked substantial capacity to conform his conduct to the requirements of the law. This was not error. See Commonwealth v. Ahearn, 421 Pa. 311, 218 A. 2d 561 (1966), and Commonwealth v. Woodhouse, 401 Pa. 242, 164 A. 2d 98 (1960). As stated in Commonwealth v. Ahearn, supra, at 324, 218 A. 2d at 568, such evidence is not admissible '(1) to absolve or exculpate and acquit a defendant of crime, or (2) to prove a lack of specific intent to kill, and thereby prohibit a verdict of murder of the first degree.' See also, Commonwealth v. Carroll, 412 Pa. 525, 194 A. 2d 911 (1963). Moreover, this testimony was properly received in evidence and considered by the court in mitigation of the penalty during the hearing to determine the sentences to be imposed."

In *Commonwealth v. Ahearn*, 421 Pa. 311, 218 A. 2d 561, defendant, while represented by three lawyers, pleaded guilty to the murder indictment. He was found guilty of murder in the first degree and sentenced to life imprisonment. The Court, in an Opinion by Mr. Chief Justice BELL, joined in by three other members of the Court, said (pages 314-315, 319-320, 324-325) : "We note at the outset that defendant did not take the witness stand; instead he relied upon the testimony of two psychiatrists and one psychologist who, in the last analysis, based their opinions to a large extent *upon defendant's self-serving, unsworn, uncorroborated statements to them about his prior life and his actions and reactions, some of which are fantastic.** . . . In other words, defendant contends that because of his mental condition, his excitement, and his reactions when women were involved, *it was impossible for him*

---

* Italics in *Commonwealth v. Ahearn.*

to form a specific intent to take a human life,* and consequently he could not be convicted of any crime higher than murder in the second degree. . . .

"The testimony of defendant's experts, if believed, would establish an irresistible impulse to violence in certain sexual situations. Psychiatric names or definitions vary or change almost as rapidly as 'bridge conventions'; and the use of terms such as 'irresistible impulse,' or 'diminished responsibility', or 'inability to control oneself', or *'temporary partial insanity'*,** or *various kinds of psychopaths,** are not sufficient to change what the psychiatrists used to call and what, in legal language, has always been called, an irresistible impulse.

". . .

"In Commonwealth v. Melton, 406 Pa. 343, 178 A. 2d 728, the Court aptly said (pages 349-350):

" 'There is not the remotest merit to defendant's contention that because of his deficient mentality, the Court did not have the power to convict him of murder in the first degree.

" 'In Commonwealth v. Smith, 405 Pa. 456, we sustained a verdict of guilty of murder in the first degree with penalty of death, even though defendant was a sexual psychopath. We there said (pages 459-460): "This Court has sustained a verdict of *first degree* murder with penalty of death where defendant allegedly had *an irresistible impulse,** was a moron or a mental defective or a sexual pervert or *a psychopathic personality,** or had been previously confined in the hospital for the criminal insane for 14 years, or was a schizophrenic psychopath or was an unstable, mentally

---

* Italics in *Commonwealth v. Ahearn* and in *Commonwealth v. Melton.*

** Italics, ours.

defective moron, or was feeble-minded: Commonwealth v. Leamer, 386 Pa. 485, 126 A. 2d 409; Commonwealth v. Cole, 384 Pa. 40, 119 A. 2d 253; Commonwealth v. Gossard, 383 Pa. 239, 117 A. 2d 902; Commonwealth v. Elliott, 371 Pa. 70, 89 A. 2d 782; Commonwealth v. Carluccetti, 369 Pa. 190, 85 A. 2d 391; Commonwealth v. Givens, 363 Pa. 141, 69 A. 2d 142; Commonwealth v. Neill, 362 Pa. 507, 67 A. 2d 376; Commonwealth v. Howell, 338 Pa. 577, 13 A. 2d 521; Commonwealth v. Hawk, 328 Pa. 417, 196 A. 5; Commonwealth v. Stabinsky, 313 Pa. 231, 169 A. 439.'' '

"Defendant in the instant case makes the same contentions as were made in the aforesaid cases, but instead of calling himself a mental defective or a sexual pervert, or some kind of a psychopath, or that he had an irresistible impulse, he contends that his is a case of 'diminished responsibility.' By whatever name psychiatrists, or doctors or lawyers call it, an inability to control one's self under certain circumstances is legally insufficient to justify an acquittal of murder, or a reduction of a first degree murder killing to second degree.

"...

"In Commonwealth v. Tyrrell, 405 Pa., supra, the Court sustained a verdict of first degree murder with penalty of life imprisonment and pertinently said (pages 219-221) : 'As a result Dr. Coleman determined that the defendant was psychotic since teen age and that he was so emotionally upset on March 7, 1960, that "he would react to an impulse to pick up a loaded shotgun resting at his elbow and fire it at his wife, and that at that time he had no intent to take his wife's life."

" 'The doctrine of "irresistible impulse" or in the modern psychiatric vernacular "inability to control one's self", *whether used to denote legal insanity, or*

*as a device to escape criminal responsibility for one's acts or to reduce the crime or its degree, has always been rejected in Pennsylvania.* *

". . .

"We hold that the psychiatric testimony offered in this case is not admissible (1) to absolve or exculpate and acquit a defendant of crime, or (2) to prove a lack of specific intent to kill, and thereby prohibit a verdict of murder of the first degree. This has always been the law of Pennsylvania. Commonwealth v. Tyrrell, 405 Pa., supra. We further hold that since the Act of December 1, 1959, P. L. 1621, 18 P.S. §4701, (popularly known as the Split Verdict Act), unless psychiatric testimony is introduced for the purpose of showing insanity under the M'Naghten Rule, (a) it is admissible only after guilt has been determined by a jury or Court, and (b) is relevant and admissible thereafter only for the limited purpose of aiding the jury or Court in fixing the penalty.

"In Commonwealth v. Elliott, 371 Pa. 70, 89 A. 2d 782 (which was decided before the Split Verdict Act) the Court pertinently said (pages 75-76) : 'Defendant contends that because a criminal or murderer is a weak, unstable, aggressive, dangerous moron who is mentally deficient, the sentencing Judge or Court (1) must consider his record during his entire life and particularly reports of every psychologist and psychiatrist who has examined him, and (2) must be *controlled* ** by these reports and impose a sentence in the case of murder in the first degree not higher than life imprisonment. This contention carries the theory or doctrine of "diminished responsibility" to an extreme and would vest in a psychiatrist and not in the Courts the right and power to determine and fix punishment for crimes.

---

* Italics in *Commonwealth v. Ahearn.*

** Italics in *Commonwealth v. Elliott..*

*Such a theory or philosophy would soon transfer the punishment of criminals from Courts to psychiatrists and would inevitably result in a further breakdown of law enforcement and eventual confusion and chaos. Fortunately our cases are opposed to such an undesirable result.' ''*

For all of the above reasons, we find no merit in any of appellant's contentions.

Judgment of sentence affirmed.

---

CONCURRING OPINION BY MR. JUSTICE BARBIERI:

I concur in the result reached by Chief Justice BELL, because I believe that unless the M'Naghten rule is discarded or amended (which neither the view of the majority, nor that of the dissent would require) the expert psychiatric testimony offered is properly excludable as irrelevant. In my view, therefore, the competency of such expert witness is not in issue.**

---

DISSENTING OPINION BY MR. JUSTICE ROBERTS:

In sub silentio fashion the majority seeks to chain this Court to the distant past with respect to the admissibility of psychiatric evidence. As quoted in *Commonwealth v. Rightnour*, 435 Pa. 104, 253 A. 2d 644 (1969) : " 'If a doctor were to bleed his patients with leeches today, or if a psychiatrist were to attribute insanity to the moon, the hue and cry would be tremendous. And yet instance after instance may be pointed out wherein the law has remained, sometimes for hundreds of years, curiously rigid, despite the changes in scientific opinion upon which the law was based. Many rules in the criminal law are still affect-

---

* Italics in *Commonwealth v. Ahearn*.

** In addition to our cases cited in the majority and dissenting opinions, see *U. S. ex rel. Phelan v. Brierly* (No. 18,880, October 26, 1971).

ed by early views concerning psychology, which views are now outmoded or repudiated by newer discoveries through experimentation. A large number fail utterly to take cognizance of advances in education and educational methods.' Woodbridge, Some Unusual Aspects of Mental Irresponsibility in the Criminal Law, 29 J. Crim. Law & Criminology 822 (1938-39), quoted in Taylor, Partial Insanity as Affecting the Degree of Crime—A Commentary on Fisher v. United States, 34 Calif. L. Rev. 625 (1946)." Id. at 120, 253 A. 2d at 652 (dissenting opinion).

The defendant contends that the trial court erred in excluding psychiatric evidence offered to prove that he was incapable of acting with deliberateness and premeditation required for guilt of murder in the first degree.[1] The majority cursorily dismisses this contention as being inconsistent with the "well-established law in this Commonwealth." Quite the contrary our Court has twice in recent years been evenly divided on the issue of whether such psychiatric evidence is admissible. See *Commonwealth v. Weinstein*, 442 Pa. 70, 274 A. 2d 182 (1971); *Commonwealth v. Rightnour*, supra. Several members of this Court have maintained that such evidence should be admissible. See *Commonwealth v. Weinstein*, supra at 89, 274 A. 2d at 182 (opinion

---

[1] The statutory definition of murder in the first degree is: "All murder which shall be perpetrated by means of poison, or by lying in wait, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration of, or attempting to perpetrate any arson, rape, robbery, burglary, or kidnapping, shall be murder in the first degree. All other kinds of murder shall be murder in the second degree." Act of June 24, 1939, P. L. 872, as amended, 18 P.S. §4701. Since the Commonwealth did not allege that the murder in this case was committed by poison or while lying in wait or during the commission of a felony they had the burden of proving that the murder was "willful, deliberate and premeditated."

in support of reversal of judgment by ROBERTS, J., in which JONES and POMEROY, JJ., joined); *Commonwealth v. Rightnour,* supra at 120, 253 A. 2d at 652 (dissenting opinion by ROBERTS, J., in which JONES, J., joined); *Commonwealth v. Phelan,* 427 Pa. 265, 281, 234 A. 2d 540, 550 (1967) (dissenting opinion by ROBERTS, J.); *Commonwealth v. Ahearn,* 421 Pa. 311, 331, 218 A. 2d 561, 571 (1966) (dissenting opinion by ROBERTS, J., in which JONES, J., joined). My views have not waivered and accordingly I feel compelled to dissent.

It should be noted that the last time our Court confronted this issue in *Commonwealth v. Weinstein,* supra, only one member of the Court explicitly affirmed the retention of the present rule. Two members of the Court concurred in the result, while three members of the Court urged that in light of progress made in the field of psychiatry we reject our archaic rule.

In ignoring the scientific advances that have been made in the field of psychiatry in the last few decades this Court finds itself opposed by almost all of the significant authorities.[2] The 4-3 opinion in *Ahearn,* supra, which held that psychiatric testimony was inadmissible in determining the degree of guilt, is supported

---

[2] See, e.g., American Bar Foundation, The Mentally Disabled and the Law (1961); Menninger, The Crime of Punishment (1968); Kaplan, Punishment and Responsibility in Aquarius, 20 Buff. L. Rev. 181 (1970); Pourus, The Psychiatrist's Role in Determining Accountability for Crimes; The Public Anxiety and an Increasing Expertise, 52 Marq. L. Rev. 380 (1969); Taylor, Partial Insanity as Affecting the Degree of Crime—A Commentary on *Fisher v. United States,* 34 Calif. L. Rev. 625 (1946); Weihofen and Overholser, Mental Disorder Affecting the Degree of a Crime, 56 Yale L.J. 959 (1946); Comment, *Commonwealth v. Ahearn:* Psychiatric Testimony Ruled Inadmissible in Murder Trial to Show Lack of Deliberation and Premeditation, 71 Dick. L. Rev. 100 (1966); Note, Diminished Responsibility and Psychiatric Testimony in Pennsylvania, 28 U. Pitt. L. Rev. 679 (1967).

by only a dwindling minority of jurisdictions. In recent years several additional jurisdictions which at one time followed a rule similar to *Ahearn* have unanimously repudiated their old view and have embraced the modern and prevailing concept of diminished responsibility.[3] See, e.g., *State v. DiPaolo,* 34 N.J. 279, 168 A. 2d 401 (1961), followed in *State v. Sikora,* 44 N.J. 453, 210 A. 2d 193 (1965) ; *People v. Wells,* 33 Cal. 2d 330, 202 P. 2d 53 (1949) (dissents on other grounds), followed in *People v. Henderson,* 35 Cal. Rptr. 77, 386 P. 2d 677 (1963) and *People v. Gorshen,* 51 Cal. 2d 716, 336 P. 2d 492 (1959) ; *Battalino v. People,* 118 Colo. 587, 199 P. 2d 897 (1948) ; *State v. Gramenz,* 256 Iowa 134, 126 N.W. 2d 285 (1964). England, whose judicial system created the M'Naghten Rule, has now by Act of Parliament recognized the concept of partial responsibility. English Homicide Act, 1957, 5 & 6 Eliz. II, c.11, §2(1) ; see *Regina v. Dunbar,* 41 Cr. App. R. 182 (1957).

The highly praised and influential Model Penal Code explicitly adopts the principle of diminished responsibility: "Evidence that the defendant suffered from a mental disease or defect is admissible whenever it is relevant to prove that the defendant did or did not have a state of mind which is an element of the offense." A.L.I. Model Penal Code §4.02 (1) (proposed official draft 1962). The mere recitation of a dramatic shift of authority may not, by itself, be sufficient reason for this Court to relinquish its former

---

[3] Although the terms "partial" and "diminished" responsibility are the common vehicles used by writers and courts to describe the theory we discuss today, they are highly misleading. They connote that the defendant is somehow not fully responsible for his actions. In actuality the defendant is fully responsible, but only for a crime which does not require the elements of premeditation and deliberation. The terms will be employed here, not for their appropriateness but for their familiarity.

position. Such an inexorable trend should, however, be the catalyst for at least close scrutiny and careful review of the merits of the *Ahearn* rule and the jurisprudential propriety of its continuance.

The anomalies inherent in maintaining the *Ahearn* rule bear articulation once more. The Legislature has created a distinction between first and second degree murder based on a determination of whether the defendant committed the slaying with premeditation. When a defendant pleads guilty to murder generally, as the defendant did in this case, the offense charged in the indictment is presumed to be murder in the second degree. *Commonwealth v. Barnosky,* 436 Pa. 59, 63, 258 A. 2d 512, 514 (1969); *Commonwealth ex rel. Kerekes v. Maroney,* 423 Pa. 337, 340, 223 A. 2d 699, 701 (1966). To raise the offense to first degree murder the Commonwealth has the burden of proving beyond a reasonable doubt that the slaying was "willful, deliberate and premeditated. . . ."

The *Ahearn* rule compels the trial court to prohibit a defendant from introducing evidence which would be relevant in deciding whether he possessed sufficient mental capacity to have the requisite state of mind for first degree murder. That such evidence is relevant and probative is beyond cavil. A leading commentator has offered the following test for relevancy: ". . . does the evidence offered render the desired inference *more probable than it would be without the evidence? . . .* Relevant evidence, then, is evidence that in some degree advances the inquiry, and thus has probative value, and is prima facie admissible." McCormick, Evidence §152, at 318-19 (1954) (emphasis in original); 1 Wigmore, Evidence §§9-10, at 289-95 (3d ed. 1940). Surely expert psychiatric evidence on the defendant's state of mind at the time of the commission of the crime meets this classic definition of relevancy.

Our Court has long recognized that excessive indulgence of alcohol might so impair a defendant's mind as to negate the possibility of deliberation and premeditation: "Intoxication sufficient to deprive the mind of power to form a design with deliberation and premeditation, and to properly judge the legitimate consequences of such an act, will reduce a killing from murder in the first degree to murder in the second degree." *Commonwealth v. Ingram*, 440 Pa. 239, 270 A. 2d 190 (1970); *Commonwealth v. Brown*, 436 Pa. 423, 260 A. 2d 742 (1970); *Commonwealth v. Walters*, 431 Pa. 74, 244 A. 2d 757 (1968); *Commonwealth v. McCausland*, 348 Pa. 275, 35 A. 2d 70 (1944); *Commonwealth v. Kline*, 341 Pa. 238, 19 A. 2d 59 (1941); cf. *Commonwealth v. Tarver*, 446 Pa. 233, 284 A. 2d 759 (1971). The inconsistency between the majority's exclusion of psychiatric evidence that would illustrate the defendant's state of mind and this Court's acceptance of evidence showing that defendant's mind was impaired by the usage of alcohol or drugs is apparent. As two leading commentators have reasoned: "That a person who kills another without deliberation and premeditation cannot be held liable for first degree murder would seem self-evident under the usual statute defining the crime in terms of those mental elements; and this would seem to be true whether the lack of deliberation and premeditation was attributable to provoking circumstances, intoxication, mental disorder or any other cause."[4] It should also be remembered that whereas mental disability caused by excessive drug or alcohol use is self-inflicted, mental illness is a malady whose origins are exogeneous to any volitional conduct of the defendant.

Psychiatric evidence is fully admissible at the sentencing stage of the proceeding. In allowing such evi-

---

[4] Weihofen and Overholser, supra note 1 at 959.

dence this Court has given approval to the concept of diminished responsibility: ". . . mitigating circumstances may be considered by the jury in fixing the penalty. 'Diminished responsibility is a scientific fact, scientifically established and capable of being analyzed.' " *Commonwealth v. Stabinsky*, 313 Pa. 231, 238, 169 Atl. 439, 442 (1933). Why such evidence is considered useful and acceptable at the stage of sentencing but is not admissible during the earlier determination of whether the defendant had the requisite mental intention prescribed by the statute has never been explained by the adherents to the *Ahearn* rule.

Whatever validity might once have attached to the old "curiously rigid" objections to the admission of psychiatric evidence to establish diminished mental responsibility they have long since been "outmoded and repudiated by new discoveries through experimentation." Unfortunately, these early views "fail utterly to take cognizance of advances in education and educational methods." It is of course completely inconsistent to contend that the state of the art of psychiatry is too unreliable to be received as scientific opinion in the degree of guilt phase but completely acceptable and reliable as evidence in three other important phases of the trial: whether the defendant was sane or not at the time of the commission of the crime; whether the defendant was competent to stand trial; and what should be the appropriate sentence. Nor is it true that the M'Naghten Rule and the defense of diminished responsibility cannot coexist; on the contrary several jurisdictions have found the two completely compatible. See, e.g., *People v. Henderson*, supra; *State v. DiPaolo*, supra; *Battalino v. People*, supra; *State v. Gramenz*, supra.

It has been contended that the basis of the psychiatric evidence is the inherently unreliable self-serving

statements made by the defendant. Initially it might be noted that the same potential infirmity exists in the area of determining sanity under the M'Naghten Rule as well as at the sentencing stage. Additionally such an assertion ignores the ability and expertise of trained psychiatrists to delineate candid admissions and elaborate fabrications. Indeed, one expert has frankly stated: ". . . the insane do not lie—they expose the truth with alarming candor." Roche, Truth Telling, Psychiatric Expert Testimony and the Impeachment of Witnesses, 22 Pa. B.Q. 140, 146 (1951). Nor should there be any concern that the admission of such evidence will usurp the position of the judge and jury as the ultimate arbitrators of the defendant's guilt or innocence. More realistically the effects of repudiating the *Ahearn* rule will be to better equip the finders of fact in their search for the truth.

Opponents of the defense of diminished responsibility have expressed concern that the effect of making such a defense cognizable will be shorter sentences for dangerous individuals. One proposal which answers such a concern is that proffered by a study done on the mentally disabled and the law completed by the American Bar Foundation: "The defense of partial responsibility should be available to defendants but the reduced prison confinement should be followed by a period of indeterminate hospitalization when necessary for the public safety. The defense should be allowed when the defendant was incapable of some mental process which is a necessary element of the definition of the crime charged. He should be held responsible and punished for the lesser but related crime which does not require that mental process. But, if he is suffering from a mental condition which predisposes the accused to continued criminal activity, he should be retained in a mental institution until his release is consistent

with public safety."[5]   An alternate and corrective procedure is available through the Mental Health and Retardation Act.[6]  Instead of a reduction in the degree of the crime the treatment of the defendant is provided under §413 of the Act: "Whenever any person charged with any crime is acquitted on the ground of insanity or having been insane at the time he committed the crime, the jury or the court as the case may be, shall state such reason for acquittal in its verdict, (b) In such event, the court may direct the Attorney for the Commonwealth to act as a petitioner to initiate commitment proceedings under section 406." Section 406 permits, inter alia, an officer or agent of a governmental health or welfare organization or agency or "any responsible person" to bring the petition to commit any person in need of care.

The social objectives of our criminal statutes in general, and our murder statutes in particular, must be recalled.   In most cases society is more interested in punishing the defendant's state of mind than it is in punishing the defendant for the commission of the act itself.   It is a general principle of our law "that the state of mind with which a person commits a criminal act is important in determining not only whether he should be punished therefor, but also, if he is to be punished, how severely."[7]  For this reason an attempted crime is traditionally punished the same as the actual consummation of the crime itself.   As reprehensible as the act in first degree murder is the state of mind that led to its commission.   Nor would the social objectives of deterrence be accomplished by according the same sanction to those whose offense was "willful, deliberate

[5] American Bar Foundation, supra note 1 at 367.

[6] Mental Health and Retardation Act of 1966, Special Sess. No. 3, October 20, P. L. 96, art. IV, §413, 50 P.S. §4413.

[7] Weihofen and Overholser, supra note 1 at 962.

and premeditated" and to those who were mentally incapable of deliberation and premeditation. As the report by the American Bar Foundation concluded: "If the objective of this heavier sanction be deterrence, it is doubtful that a person incapable of premeditation and deliberation will be dissuaded from committing a premeditated murder by the higher penalty imposed for murder accompanied by these mental processes. Nor is a 'fully responsible' person likely to be deterred because those who are incapable of premeditation also face the same punishment. If this differential treatment reflects a community attitude that 'cold-blooded' murder is somehow more culpable than killing which springs from momentary impulses, these traditional notions are actually undermined by inflicting the penalty reserved for the 'cold-blooded' on those capable only of the impulse."[8]

I dissent.

Mr. Justice POMEROY and Mr. Justice JONES join in this dissent.

---

[8] American Bar Foundation, supra note 1 at 356.