Commonwealth *v.* Butcher, Appellant.

Argued April 21, 1972. Before JONES, C. J., EAGEN, O'BRIEN, ROBERTS, NIX and MANDERINO, JJ.

*Lawrence E. Wood,* Assistant Public Defender, with him *W. Peter Barnes,* Assistant Public Defender, for appellant.

*James R. Freeman,* Assistant District Attorney, with him *William H. Lamb,* District Attorney, for Commonwealth, appellee.

OPINION BY MR. JUSTICE NIX, May 4, 1973:

In December, 1968, appellant, Gary Rayford Butcher, was arrested and charged with murder, robbery, burglary and conspiracy. Following a jury trial, appellant was found guilty of voluntary manslaughter and conspiracy.[1] After post-trial motions were denied, appellant was sentenced to a term of six to twelve years on the voluntary manslaughter conviction and a term of one to two years on the conspiracy conviction, the sentences to run consecutively. This is a direct appeal from the judgment of sentence entered in the court below.[2]

Appellant raises three issues on this appeal: (1) whether he was properly advised of his constitutional rights before giving a statement to police: (2) whether the trial judge correctly charged the jury that one may

---

[1] The burglary charge had been removed from the jury's consideration, and appellant was acquitted on the charge of robbery.

[2] Appellate jurisdiction of the judgment imposed on the conspiracy conviction is in the Superior Court. The Appellate Court Jurisdiction Act of July 31, 1970, P. L. 673, art. III, §302, 17 P.S. §211.302 (Supp. 1972-73). The record before us does not indicate that an appeal from this judgment has been filed in this Court.

be guilty of a felony-murder even though the intent to commit the felony is formed after the commission of the homicide; and (3) whether a jury should be permitted to convict of voluntary manslaughter when the evidence does not support the charge. We find all of appellant's contentions to be without merit and affirm his conviction.

The evidence offered by the Commonwealth was as follows: On December 6, 1968, at approximately 8:30 A.M., the body of Doctor Armstead O. Grubb, an elderly professor at Lincoln University, was found in the cellar of a residence located on the campus. Initial investigation of the crime led the police to appellant and Richard Twyman and they both were arrested. Appellant, who was then fifteen years of age, was taken into custody around noon on December 6, 1968, at which time he was advised of his constitutional rights. Upon arrival at the police station, *Miranda*[3] warnings were given for the second time. A short time later, subsequent to giving the *Miranda* warnings a third time, the police commenced preliminary questioning. At that point the police determined that appellant was a juvenile and contacted his mother, Mrs. Porter. When she arrived she was informed that her son had been arrested for the murder of Doctor Grubb, and that the authorities were in the process of obtaining a statement, but had stopped pending her arrival.

Thereafter, according to the testimony of the Commonwealth witnesses, appellant was advised of his constitutional rights in the presence of his mother who indicated that she understood what had been related to her son. Appellant's statement was then taken and both he and Mrs. Porter read and signed it.

Appellant now contends that although his mother was present for questioning, she could not and did not

---

[3] 384 U.S. 436 (1966).

supply adult guidance because she was extremely upset. It is alleged that Mrs. Porter's presence was a mere formality due to her distraught condition and that absent her rational advice he could not have intelligently waived his rights. The record, however, does not support this contention. Admittedly, Mrs. Porter was distraught, which is quite understandable under the circumstances, however there is nothing to indicate that her condition was such to preclude her from understanding the situation or from suggesting to her son an appropriate course of action. She was present during the questioning, she heard the officer inform her son of his rights, she indicated that she understood these rights, and she read and signed her son's statement. Based upon her behavior throughout the interrogation process we must conclude that Mrs. Porter was aware of what was transpiring around her and capable of meaningfully conferring with her son. Accordingly, we must reject appellant's contention that his statement was involuntary due to the lack of adult guidance.

Appellant's second contention is that the trial court's instruction as to felony-murder was improper. With this contention we cannot agree. An examination of the entire charge on felony-murder reveals that the trial judge communicated the correct standards to the jury.

More specifically, appellant attacks the court's charge because it mentioned the long-standing principle that one may be guilty of a felony-murder where the intent to commit the felony is formed after the commission of the homicide as long as the death was in the perpetration of the felony. *Commonwealth v. Tomlinson,* 446 Pa. 241, 284 A. 2d 687 (1971); *Commonwealth v. Waters,* 445 Pa. 534, 285 A. 2d 192 (1971), *cert. denied,* 406 U.S. 961 (1972); *Commonwealth v. Wilson,*

431 Pa. 21, 244 A. 2d 734 (1968), *cert. denied,* 393 U.S. 1102 (1969) ; *Commonwealth v. Hart,* 403 Pa. 652, 170 A. 2d 850 (1961) ; *Commonwealth v. Stelma,* 327 Pa. 317, 192 A. 906 (1937). As stated in *Commonwealth v. Tomlinson,* supra: "This Court has several times decided that if a homicide occurs in the perpetration of or attempt to perpetrate a robbery or other statutorily-enumerated felonies, a conviction of murder in the first degree will be sustained regardless of when the design to commit the robbery or other felony was conceived or the felony committed." 446 Pa. at 246-47, 284 A. 2d at 690.

While this language is admittedly ambiguous, it is nevertheless based upon sound policy as it recognizes the difficulty in attempting to ascertain when the intent to rob was conceived in a given factual situation. This difficulty was emphasized in *Commonwealth v. Hart, supra,* when we noted that "defendant would require a televised stop-watch in every robbery or felony-killing to prove that the felonious intent existed before the attack. It is rare, we repeat, that a criminal telephones or telegraphs his criminal intent and consequently such intent can be properly found by the jury from the facts and circumstances in a particular case." 403 Pa. at 658, 170 A. 2d at 853-54. In all probability the rule would be better restated to indicate that if the killing is used to effectuate the robbery then it is immaterial that the intent to kill preceded the intent to rob since the force resulting in death is the force used to accomplish the robbery.

In this factual situation this particular complaint is clearly without substance. The appellant was acquitted on the charge of robbery and ultimately found guilty of voluntary manslaughter and not murder in the first or second degree. It is therefore apparent that

the jury did not utilize the felony-murder rule in reaching its verdict.

Appellant's last argument is that a verdict of voluntary manslaughter should not be permitted when the evidence does not support such a verdict. However, this Court has consistently held that a jury may in a murder prosecution return a verdict of voluntary manslaughter even where there is no evidence of passion or provocation. As stated in *Commonwealth v. Hoffman*, 439 Pa. 348, 356-57, 266 A. 2d 726, 731 (1970) : "Few propositions are better established in the criminal law than the doctrine that where the evidence would be sufficient to support a conviction of murder, the return of a verdict of voluntary manslaughter is strictly within the jury's prerogative even in the absence of provocation and passion." (footnote omitted). *See Commonwealth v. Hill*, 444 Pa. 323, 281 A. 2d 859 (1971) ; *Commonwealth v. Harry*, 437 Pa. 532, 264 A. 2d 402 (1970) ; *Commonwealth v. Dennis*, 433 Pa. 525, 252 A. 2d 671 (1969).

The gravamen of both first degree murder and voluntary manslaughter is the intentional inexcusable and unjustified killing of a human being. Both crimes require the finding of a specific intent to kill and are thereby distinguished from second degree murder. First degree murder requires the presence of malice which justifies the imposition of a more severe sentence, whereas voluntary manslaughter is an act resulting from passion arising from legal provocation. Thus, where there is a finding of voluntary manslaughter under a factual situation that would suggest first degree murder the verdict is consistent with the evidence insofar as it reflects an intentional inexcusable and unjustifiable killing. To rule that because the testimony failed to establish those elements which the law has recognized as a legitimate basis for reducing an inten-

tional homicide from first degree murder that a finding of voluntary manslaughter must be vacated and the defendant consequently discharged would be an adherence to form completely oblivious to our responsibility to society. The symmetry of the law at times must give way to the policy sought to be effectuated. Thus, even though the jury was moved by mitigating factors not recognized by the law in determining that the lesser of the two charges should be found, we will not disturb their determination.

Under the evidence offered by the Commonwealth in the instant case the propriety of a verdict of murder in the first degree would have been unquestioned. On the afternoon of December 5, 1968, appellant, the co-defendant, and the co-defendant's brother had been together and had talked about "getting" Dr. Grubb. Later that evening appellant and Richard Twyman, the co-defendant, went to the doctor's home, found that he was not there, and proceeded to wait for his arrival in the vacant house next to the doctor's residence. When the doctor arrived they used various tricks to lure him from his home and accosted him in the vacant premises where they administered a severe beating which resulted in his death. At this time they took from the person of the deceased $40.00 and some keys.

At trial, testimony was offered by a pathologist to the effect that the deceased had been struck eight times on or about the head. It was further stated that these blows resulted in three fractures of the skull, any one of which could have occasioned death.

Judgment of sentence affirmed.

Mr. Justice ROBERTS and Mr. Justice MANDERINO concur in the result.

Mr. Justice POMEROY took no part in the consideration or decision of the case.